**BILLY J. WILLIAMS, OSB #901366**
United States Attorney
District of Oregon
**JAMES E. COX, JR., OSB # 085653**
jim.cox@usdoj.gov
Assistant United States Attorney
United States Attorney's Office
District of Oregon
1000 SW Third Ave., Suite 600
Portland, Oregon 97204-2902
Telephone:   (503) 727-1026
Facsimile     (503) 727-1117
Attorneys for Defendants the United States of America and James Richard Perry
("Federal Defendants")

### THE UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

| | |
|---|---|
| **ANDREA OLSON**, an individual, | Case No. 3:15-cv-02216-HZ |
| Plaintiff, | **FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |
| v. | |
| **UNITED STATES OF AMERICA**, by and through the Department of Energy and Bonneville Power Administration; and **JAMES RICHARD PERRY**, Secretary of the Department of Energy, | |
| Defendants. | |

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................ **5**

II. FACTUAL BACKGROUND ........................................................... **6**

   *A. Plaintiff's Contract Position as BPA's Reasonable Accommodation Coordinator.* ................................................................................. *6*

      1.   The 2010 direct contract with BPA. .......................................... 6

      2.   The 2012 transfer to work through the BPA-MBO contract. ...... 8

      3.   Olson's work structure as the RAC. ......................................... 9

   *B. BPA's Decision to Reassign the RAC Position to a Full-Time Non-Contract Federal Employee.* .................................................... *10*

   *C. Olson's Conflicts with Co-Workers, Absence from Work, and Contract Dispute.* .............................................................................. *13*

      1.   Olson's work conflicts with co-workers. ................................. 13

      2.   Olson's initial absence from work and contract dispute. .......... 14

      3.   BPA's reassignment of the RAC position. ................................ 16

      4.   Olson's failure to return to work. ............................................ 18

   *D. Prior Administrative and District Court Proceedings.* .................... *20*

III. STANDARD OF REVIEW ........................................................... **21**

IV. ARGUMENT .............................................................................. **22**

   *A. Olson Was Not a BPA Employee.* ..................................................... *23*

   *B. BPA Did Not Willfully Violate Olson's FMLA Rights.* ...................... *25*

      1.   Olson Must Establish that any FMLA Violation Was Willful. ............... 25

      2.   Olson Rejected BPA's Invitation to Return to Work. ............... 26

         a.     The transfer of the RAC position did not end Olson's work assignment. .................................................................... 28

         b.     BPA's requirement that Olson come back to the office in order to resume working does not mean her work assignment was terminated. ........ 30

         c.     BPA's decision to cut off Olson's access to the BPA network during her extended absence does not indicate her work assignment was terminated. 31

V. CONCLUSION ............................................................................ **32**

## TABLE OF AUTHORITIES

**Cases**

*Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) ............ 22, 23

*Bass v. Potter*, 522 F.3d 1098, 1104 (10th Cir. 2008) ................................. 29

*Boucher v. Shaw*, 572 F.3d 1087, 1090–91 (9th Cir. 2009) ........................ 24

*Burnett v LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006) ............................ 23

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ...................................... 21

*Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981) ...................... 24

*Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33, (1961) ............................ 24

*Hanger v. Lake Cty.*, 390 F.3d 579, 583 (8th Cir. 2004) ............................ 29

*Hillstrom v. Best W. TLC Hotel*, 354 F.3d 27, 29 (1st Cir. 2003) .............................. 29

*Hoffman v. Professional Med Team*, 394 F.3d 414 (6th Cir. 2005) ........................... 30

*Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 252 (6th Cir. 2004) ........................ 27

*Hollowell v. Kaiser Found. Health Plan of the Nw.*, No. 14-35882, 2017 WL 2839500, at *1 (9th Cir. July 3, 2017) ................................................... 29

*James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013) ........................ 27

*Johnson v. Houston's Rest. Inc.*, 167 F. App'x 393, 396 (5th Cir. 2006) .................... 28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).......... 21

*McDonnell Douglas v. Green*, 411 U.S. 792 (1993)...................................... 23

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) .................................... 29

*Perez v. Oak Grove Cinemas, Inc.*, 68 F. Supp. 3d 1234, 1242 (D. Or. 2014) ............ 24

*Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011....................... 22, 23, 25

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.

1987) ........................................................................................................ 21

*United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539 (9th Cir.1989) ... 21

*Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003 ................................. 26

### Statutes

29 U.S.C. § 203(e)(2) .............................................................................. 24

29 U.S.C. § 203(g) ..................................................................................... 24

29 U.S.C. § 2611(1)(B)(i) .......................................................................... 23

29 U.S.C. § 2614(a)(3)(B) ......................................................................... 28

29 U.S.C. § 2615(a)(1) .............................................................................. 22

29 U.S.C. § 2615(a)(2) .............................................................................. 22

29 U.S.C. § 2615(b) ................................................................................... 22

29 U.S.C. § 2617(a) ................................................................................... 23

29 U.S.C. § 2617(c)(1) ............................................................................... 25

29 U.S.C. § 2617(c)(2) ............................................................................... 25

29 U.S.C. 2611(3) ...................................................................................... 23

### Rules

29 C.F.R. § 1614.107(a)(3) ....................................................................... 20

Fed. R. Civ. P. 56(a) .................................................................................. 21

# MOTION

Defendants the United States of America and James Richard Perry ("Federal Defendants"), by Billy J. Williams, United States Attorney for the District of Oregon, and through James E. Cox, Jr., Assistant United States Attorney for the District of Oregon, submit Federal Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a).   This motion is based on the accompanying memorandum of law, the concurrently-filed Declarations of Sharon Hale-Mockley, Scott R. Hampton, Brian E. Carter, and James E. Cox, Jr. and the exhibits attached thereto, and all pleadings of record herein.   Pursuant to Local Rule 7-1, the parties made a good faith effort to resolve this dispute and have been unable to do so.[1]

# MEMORANDUM IN SUPPORT

## I.    INTRODUCTION

Plaintiff Andrea Olson ("Olson") worked for the Bonneville Power Administration ("BPA") from 2010-2014, performing reasonable accommodation services for the BPA workforce on a contract basis.   In March 2014, she began an extended absence from work from which she never returned, despite efforts by BPA managers to encourage her to return.

---

[1] While the parties did not discuss this motion in a telephone conference, undersigned counsel did reach out to plaintiff and her representative via email to discuss the motion.   It became evident through this email that a telephone conference would not enable the parties to resolve this motion.

In this action, Olson asserts that BPA violated the Family and Medical Leave Act ("FMLA") by failing to restore her to her position at BPA.   While BPA should be granted summary judgment because Olson was not a BPA employee, Olson's claims fail for the even more basic reason that the BPA never took any adverse action against her due to her absence from work.   Rather, BPA paid her for all of the time she billed, and allowed her to return to work.   The reason that Olson quit working for BPA was her unwillingness or inability to return to work, neither of which can be attributed to BPA.   Thus, summary judgment on Olson's claims against the Federal Defendants are appropriate.

## II.      FACTUAL BACKGROUND

### A.      Plaintiff's Contract Position as BPA's Reasonable Accommodation Coordinator.

#### 1.      The 2010 direct contract with BPA.

The Bonneville Power Administration ("BPA") is a nonprofit federal power marketing administration based in the Pacific Northwest.   (Declaration of James E. Cox, Jr. ("Cox Decl."), Ex. 1.)   BPA is part of the U.S. Department of Energy but is self-funding and covers its costs by selling its products and services.   (*Id.*)   BPA markets wholesale electrical power from 31 federal hydroelectric projects in the Northwest, one nonfederal nuclear plant and several small nonfederal power plants. (*Id.*)   BPA also operates and maintains about three-fourths of the high-voltage transmission in its service territory.   (*Id.*)   BPA's territory includes Idaho, Oregon, Washington, western Montana and small parts of eastern Montana, California, Nevada, Utah and Wyoming.   (*Id.*)

In early 2010, BPA solicited bids on a contract to provide reasonable accommodation ("RA") services to the BPA workforce.    (Declaration of Sharon Hale-Mockley ("Hale-Mockley Decl."), ¶ 2.)    The solicitation occurred because of BPA's desire to fill the reasonable accommodation coordinator ("RAC") position with an individual with professional credentials and greater expertise in the RA field.    (*Id.*) The position included the following duties:

1. Ensure that BPA meets compliance with Equal Employment Opportunity Commission (EEOC) guidelines, the American with Disabilities Act (ADA), and BPA policy.
2. Provide an assessment to an employee who requests reasonable accommodation based on medical documentation received by the employee's physician, the current position description of the employee's essential duties, and the manager's evaluation of the essential functions of that position.
3. Determine if any specialized equipment, furniture, hardware, software or other assistive devices or accommodation reasonable to the agency, will aid in the employee's function and performance of those essential duties.
4. Document and report the nature of the qualifying disability (or medical condition), the outcome of the assessment, and the accommodation provided and how each employee's "case" is in compliance with EEOC guidelines, the ADA and BPA's Reasonable Accommodation program (or did not meet those qualifications).
5. Maintain records of requests for accommodations and their dispositions, which will include managing BPA's Reasonable Accommodation files, documents, reports and applicable database systems and internal programs.
6. Provide assistance to managers with their employees' accommodation issues.
7. Provide managers and employees with timely information regarding the program (i.e., electronic or hard-copy documents, internal web pages); help manager recognize requests by providing informal training or meetings, and/or providing on-line informal training

(*Id.*, Ex. 1 at p. 26; Declaration of Scott Hampton ("Hampton Decl."), Ex. 2 at p. 4.)

After receiving bids, BPA selected Pacific Disability Management ("PDM"), a company owned and operated by Plaintiff Andrea Olson, to fill the contract.   (Hale-Mockley Decl. ¶ 3.)   The contract between BPA and PDM was for one base year, January 1-December 31, 2010, with four unilateral options for BPA to extend the contract annually for calendar years 2011-2014.   (*Id.*, Ex. 1 at p. 5.)   The contact provided for an hourly price of $95.00 in the base year and the first two option years, escalating to $98.04 and $101.18 in the last two option years.   (*Id.*)

Olson worked as BPA's RAC in 2010 and 2011 under the terms of this direct contract with BPA.   In late 2011, BPA became concerned of a risk that the Internal Revenue Service would find that Olson qualified as a BPA employee for tax purposes.   (Hampton Decl., ¶ 2.)   For that reason, BPA did not exercise the second option year on its contract with PDM.   (*Id.*)   Instead, if Olson wished to continue working for BPA, BPA required her to work under an existing master services agreement ("MSA") that BPA had with a company called MBO Partners in which MBO acted as a payroll service for some BPA independent contractors.   (*Id.*)

### 2.   The 2012 transfer to work through the BPA-MBO contract.

Olson signed a General Service Agreement ("GSA") with MBO on January 10, 2012.   (ECF 18.)   In the GSA, Olson acknowledged that she was to be engaged to perform work for BPA on "an assignment-by-assignment basis" and that the work "to be performed on each assignment will be

specified by" BPA.  (*Id.*)   The GSA provided that BPA "is free to select [Olson], or not, for any assignment" and that Olson "is free to accept any assignment, or not."  (*Id.*)   The GSA provided that BPA would issue work orders for Olson's services which would specify the time period and rate for the work to be performed.  (*Id.*)

The MSA between BPA and MBO confirmed the nature of the work relationship indicated in the GSA.   The MSA provided that Olson was engaged to perform tasks set forth on an "assignment-by-assignment basis" and that the work to be performed would be specified in work orders that would become addendums to the MSA.   (Hampton Decl., Ex. 1 at p. 52.)

BPA issued work orders from 2012 through 2014 that specified the rate and time period of Olson's work under the MBO MSA.   (*Id.*, Ex. 3.)   The work orders provided that "[a]ssignment end dates do not obligate BPA to retain the Cont[r]act Worker or position through the dates listed; assignment end dates may be ended at the sole discretion o[f] BPA, at any time." (*Id.*)

### 3.    Olson's work structure as the RAC.

Sharon Hale-Mockley ("Hale-Mockley") was the BPA manager who oversaw a large number of HR programs at BPA from 2009-2014, including the reasonable accommodation program operated by Olson.   (Hale-Mockley Decl. ¶ 1.)   Hale-Mockley did not consider Olson to be a BPA employee, and Olson did not receive any federal employment benefits, such as leave, retirement or health care.   (*Id.* ¶ 5; Hampton Decl. ¶ 5.)   Hale-Mockley did not assign Olson work.   (Hale-Mockley Decl. ¶ 5.)   Rather, employees and managers who desired assistance with

reasonable accommodation issues contacted Olson directly for assistance.   (*Id.*)
Performing the services of the RAC required the provision of expert services and
Olson was BPA's expert in that field.   (*Id.*)

Olson also was allowed to set her own hours based on client needs, and she
decided whether or not to work from home or at a BPA site.   (*Id.* ¶ 6.)   She was
asked to attend some staff meetings but this was for the purpose of coordinating
services with other programs in the HR group, not for review of her work.   (*Id.*)
Hale-Mockley did not provide Olson with performance reviews, evaluate her work,
or provide or suggest professional resources or training to her.   (*Id.*)

Olson was also not required to request approval for time off.   (*Id.*)   Rather,
she simply notified Hale-Mockley when she was not available to work during a day
("out of office").   (*Id.*)   Olson scheduled and paid for her own outside training
events and travel to those events.   (*Id.*)   BPA provided Olson with a laptop
computer, but she used her own cell phone.   (*Id.* ¶ 7.)   A cell phone was a critical
piece of equipment for Ms. Olson to perform her function because she frequently
worked out of the office.   (*Id.*)

## B.   BPA's Decision to Reassign the RAC Position to a Full-Time Non-Contract Federal Employee.

In the summer of 2013, BPA was recovering from a public scandal
based on its use of improper personnel practices that disadvantaged veterans
in the hiring process as well as other systematic problems within its HR
functions.   (Declaration of Brian E. Carter ("Carter Decl."), ¶ 2.)   A special
inquiry report released in October 2013 by the Office of the Inspector General

("IG") of the U.S. Department of Energy found serious and systematic problems at BPA and, in particular, within the HCM department. (*Id.*, Ex. 1.) The discovery of the improper personnel practices resulted in major changes within BPA, including the departure of many high-level managers and the temporary revocation of BPA's delegated authority to make hiring decisions. (*Id.*, ¶ 3.)

In February 2014, HCM finalized a "Get Well" project plan to "resolve the issues identified [in the IG report] and to ultimately rebuild the HR function at BPA." (*Id.*, Ex. 2 at p. 4.) Among the "remediation activities" identified in the Get Well Plan was to "optimize the BPA HR structure." (*Id.*, Ex. 2 at p. 15.) The plan noted that "it is critical to restructure and realign the BPA Human Capital Management workforce to streamline delivery and align functions to enhance accountability." (*Id.*)

In the wake of the hiring scandal, BPA's new Human Resources Director, Brian Carter ("Carter"), was charged with addressing the issues identified in the IG report and implementing the "Get Well" project plan. (*Id.*, ¶ 3.) Carter's review of the HCM workforce led him to conclude that there was an excessive reliance on contractors, which he believed made the organization less accountable, flexible, and manageable than it should have been. (*Id.*, ¶ 4.) For that reason, one step he undertook to optimize the HCM workforce was to reduce the number of contractors. (*Id.*, ¶ 4.) From 2013-2017, the number of contractors in HCM shrank from 40 to 23.

(Hampton Decl. ¶ 22.)

The RAC was one of the positions that Carter decided should be reassigned to a federal employee.    (Carter Decl. ¶ 5.)    Carter made this decision in the first couple of months after his December 2013 arrival at BPA. (*Id.*)    Several factors went into Carter's decision.    First, the RAC is required to handle employee medical records, and Carter felt that the agency should not allow such sensitive records to be handled by an outside contractor.    (*Id.*) Second, the RAC is required to advise managers and represent the agency and management before adjudicative bodies such as the Merit Systems Protection Board and the Equal Employment Opportunity Commission ("EEOC"), and Carter believed that an outside contractor should not represent the agency in such contexts.    (*Id.*)    Third, the RAC is required to obtain assistance devices used to accommodate employees with disabilities, and Carter believed that an outside contractor should not be in a position to determine the expenditure of agency funds.    (*Id.*)

While Carter believed that the RAC duty needed to be transferred to a federal employee he did not instruct Hale-Mockley to immediately reassign the RAC duty to a federal employee because he knew that BPA had an existing contract for Olson to perform the work.    (*Id.*)    He felt there was no point in reassigning the work to an employee until near the end of Ms. Olson's contract term.    (*Id.*)

### C.   Olson's Conflicts with Co-Workers, Absence from Work, and Contract Dispute.

#### 1.   Olson's work conflicts with co-workers.

In 2013, Olson became upset with the work processes of two co-workers, Matthew Mactyre ("Mactyre"), the BPA Medical Program Manager, and Dana DeBruyckere, a registered nurse in the Medical Program.   (Hale-Mockley Decl. ¶ 9.)   Olson complained to Hale-Mockley that she felt that Mactyre was inappropriately advising and advocating for employees regarding RA and that Mr. Mactyre was trying to do elements of her job.   (*Id.*)

In response to this complaint, Hale-Mockley told Mactyre that he needed to let Olson handle any RA issues.   (*Id.* ¶ 10.)   Hale-Mockley also held several conflict resolution meetings with Mactyre and Olson to try to resolve the issue and told them that they needed to meet frequently in person to improve the quality of their communications.   (*Id.*)   Both told Hale-Mockley that there were improvements when she followed up and spoke to them both together and then also each alone several times.   (*Id.*)   Hale-Mockley also instituted "watercooler meets" with other employees in the talent sustainment section in order to improve communications, understanding, and coordination of cases and to clarify roles and responsibility expectations.   (*Id.*)

At the time, Hale-Mockley believed that these steps had largely resolved the conflict.   (*Id.*)   However, Olson contacted MBO in March 2014 to request changes to her work processes.   Olson's three requests were:

1) Telework to reduce time onsite except for meetings and tasks that need to be performed onsite;

2)  Decisions that need to be made by the BPA Reasonable Accommodation Program Manager, Sharon Hale-Mockley, to be provided via email (in reply to decision requests) within a specified time fame (deemed 'reasonable' by the BPA Reasonable Accommodation Program Manager);

3)  Open communication with the DOE reasonable accommodation coordinator for guidance and best practices.

(Hampton Decl., Ex. 4.)   MBO first notified BPA of Olson's requests during a conference call on Thursday, March 13, 2014.   (*Id.* ¶ 6.)   The head of BPA's Supplemental Labor Management Office ("SLMO"), Scott Hampton ("Hampton"), was notified of Olson's request later that day and decided to meet with Olson and Hale-Mockley to discuss Olson's requests.   (*Id.*)   Before Hampton could meet with Olson to discuss her requests, though, Olson went on an extended absence from work beginning on Monday, March 17, 2014, from which she did not return.   (*Id.*)

### 2.  Olson's initial absence from work and contract dispute.

The morning of March 17th, Olson informed Hale-Mockley by email that she would not be working the week of March 17-21.   (Hale-Mockley Decl. ¶ 11, Ex. 2.) She did not explain the reason for her absence, nor did Hale-Mockley ask.   (*Id.*)

On March 19th, Olson called Hampton on his drive home from work to complain about an issue with her contract.   (Hampton Decl. ¶ 7.)   Olson's complaint was that the hourly rate for her services in her work through the MBO MSA in 2013 and 2014 did not include the rate increases that were present in the last two option years of her company's original 2010 contract with BPA, and Olson felt she should have the benefit of those increases.   (*Id.*)

During this more than hour-long phone conversation, Olson requested that she be allowed to go back to her old contract.   (*Id.*)   Hampton told Olson that was

not possible but she could request a billing increase going forward in her current contract. (*Id.*) During the call, Olson stated that she was "done" working for BPA. (*Id.*) Hampton asked Olson if she wanted to be released from her contract. Olson stated that she would think about it and said that a "lawsuit" was inevitable. (*Id.*)

On Friday, March 21st, Olson emailed Hale-Mockley that she would not be working the following week as well. (Hale-Mockley Decl., ¶ 12, Ex. 3.) Again, Olson did not explain the reason for her absence, nor did Hale-Mockley ask. (*Id.*) During this period, Olson referred BPA employees with reasonable accommodation requests or issues to Hale-Mockley. (*Id.*, Exs. 4, 5.)

On March 24th, Olson informed Hale-Mockley via email that her absences from March 17-28 were "for a medical reason." (*Id.*, Ex. 6.) This was the first notice Hale-Mockley had that some of Olson's absences from work may have been for medical reasons. (*Id.* ¶ 14.) Hale-Mockley was not aware of any medical conditions that Olson had that affected her ability to perform her job duties. (*Id.*)

Because Olson's absence was now expected to last at least two weeks and possibly longer, Hale-Mockley advised Hampton of Olson's message and requested that a meeting be held with Olson to discover more about her ability to come back to work. (*Id.* ¶ 15, Hampton Decl., Ex. 6.) Hampton was concerned about the future of BPA's relationship with Olson, given the sentiments Olson had expressed in the call the week prior and the request she had made for changes to her work conditions prior to her absence from work. (*Id.* ¶ 9.) Hampton was pessimistic about the future of the work relationship with Olson and suggested that Hale-Mockley think

about releasing Olson from her contract.   (*Id*.)   Nevertheless, he was hoping that a meeting would help "clear the air" and possibly salvage the working relationship. (*Id*.)   Hale-Mockley set up a meeting for 1:00 pm on April 1st, but Olson indicated that she might not be back to work by then.   (*Id*.; Hale-Mockley Decl., Ex. 7.)

### 3.    BPA's reassignment of the RAC position.

Olson did not return to work the week of March 31st-April 4th and, thus, the tentative April 1st meeting with Hampton and Hale-Mockley did not occur.   (*Id*. ¶ 17.)   On April 3rd, Ms. Olson informed Hale-Mockley via email that she would be out of the office the following two weeks as well.   (*Id*. ¶ 18, Ex. 9.)   At that point, Olson was scheduled to be out of work for at least five weeks with no known date of return, and Hale-Mockley was concerned that the agency would fall behind in its responsibilities in reasonable accommodation.   (*Id*. ¶ 18.)   Hale-Mockley was serving as Olson's backup for the work, and she did not feel that she had the time to ensure that the work was done appropriately, particularly for an extended period of time.   (*Id*.)   For these reasons, Hale-Mockley scheduled a meeting with Carter, the BPA HR director, for April 4th to discuss how the agency would handle the reasonable accommodation work going forward.   (*Id*.)

At the April 4th meeting, Hale-Mockley expressed her concerns to Carter that the agency would fail to keep up with its reasonable accommodation obligations if Olson's absence from work continued and with Hale-Mockley's workload, if someone else was not assigned the RAC duty.   (*Id*. ¶ 20.)   Since the length of Olson's absence was unknown, Hale-Mockley requested that she be allowed to assign the RAC position to Susan Riffel ("Riffel"), an existing federal employee in the Talent

Sustainment group.  (*Id.*)   Riffel was a logical choice to become the RAC because she had experience assisting with reasonable accommodation work in the past and was also an official BPA Purchase Card holder, which meant she had the authority to obligate funds for agency purchases.  (*Id.*)   Based on the agency's need to have the RAC position filled immediately, Carter agreed that this was a good time to move forward with the plan to have the RAC work transferred to a federal employee.  (*Id.*; Carter Decl. ¶ 7.)   Hale-Mockley and Carter agreed, though, that when Olson returned from her absence she would continue to work by helping transition Riffel into the RAC role and by providing substantive work within her area of expertise in the RA field.  (*Id.*; Hale-Mockley Decl., ¶¶ 20, 21.)

By April 9th, Olson had still not returned to work, and Hampton emailed Meghan Defibaugh, an MBO account manager, that day to find out whether MBO had any information regarding Olson's absence and, specifically, whether Olson was claiming any medical disability.  (Hampton Decl. ¶ 10, Ex. 7.)   Defibaugh had no information regarding Olson's absence and opined that MBO could not share any medical information with BPA.[2]  (*Id.*)

Hampton indicated in his email exchange with Defibaugh that BPA would

---

[2]  Unbeknownst to BPA, Olson had sent a copy of a U.S. Department of Labor Form, WH-380-E "Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)" to an MBO employee, Carol Baxter, on March 25, 2014.  (Cox Decl., Ex. 2.)   The form was signed by clinical psychologist Janice I. Volkin, Ph.D., and stated that Olson suffered from "[i]mpaired concentration[,] fatigue, anxiety[, and] episodic difficulties with emotional regulation."  (*Id.*)   In her message to Baxter, Olson requested that she be notified "prior to the release of any information contained with the document to anyone other than yourself and Megan Craft" (another MBO employee).  (*Id.*)

likely be terminating Ms. Olson's contract, however, the final decision had not been made.   (*Id*.)   Ultimately, BPA did not terminate the contract because – after consultation with a BPA attorney, and in an effort to ensure that BPA met its legal obligations with respect to Olson – Hampton determined that BPA did not have enough information to make the decision until Ms. Olson returned to work and he had a chance to discuss the working relationship with her.   (*Id*.)

Olson still had not returned to work by April 14th, and on that date Hale-Mockley officially assigned the RAC work to Riffel.   (Hale-Mockley Decl., ¶ 21, Ex. 10.)   During this time, Olson directly asked Riffel to help keep up with reasonable accommodation issues that came in as well.   (*Id*., Ex. 11.)   Meanwhile, Olson was continuing to pursue her dispute about her contract billing rate as well.   (Hampton Decl., Ex. 8.)

### 4.    Olson's failure to return to work.

On Sunday, April 27th, Ms. Olson reported and submitted an invoice to BPA for 2.1 hours of work that she performed at home that day.   (Hale-Mockley Decl., ¶ 22, Ex. 12.)   The following day, Hale-Mockley reminded Olson that she did not expect or want Olson to work while she was considering herself out of the office. (*Id*.)   While Hale-Mockley wanted Ms. Olson to return to work, she did not want Olson performing sporadic work remotely while she was considering herself out of the office because it would be confusing to have both Olson and Riffel "taking point" with clients regarding RA issues.   (*Id*.)   That could result in clients receiving conflicting information about their case, which was an issue BPA had experienced in the past.   (*Id*.)   Also, if Olson was able to work, Hale-Mockley thought it was

important for Olson to first come back to the office and discuss the nature of her job going forward due to her extended absence from work, her request for changes in her job, and the plan to transition the RAC duty to Riffel.  (*Id*.)  Olson responded negatively to Hale-Mockley's message, stating "I do not believe I have stated that I am unable to perform any work" and that "as an independent contractor, it is my judgment and decision when I work."  (*Id*.)

During this time, Hampton continued to encourage Olson to return to work. (Hampton Decl., Ex. 13.)  On June 5th, Olson met with Hampton at the BPA headquarters to discuss Olson's transition back to work and the three changes that Ms. Olson had requested in her work conditions.  (*Id*. ¶ 18, Ex. 15.)  Olson was not sure if she could come back and work the amount of time that she had been working previously, and she requested that she be allowed to do a five hour trial back in the office so that she and her medical provider could determine the next step.  (*Id*.) Hampton agreed to Olson's request, and instructed her to follow up with Hale-Mockley to coordinate her return to work for the five hour trial period.  (*Id*.)

The following week, Olson contacted Hale-Mockley regarding her transition back to work, and informed Hale-Mockley that her "attorney will be in contact with a BPA attorney soon."  (Hale-Mockley Decl., ¶ 25, Ex. 13.)  Hale-Mockley interpreted Olson's statement to mean that the return to work process needed to go through her attorney from that point forward, so Hale-Mockley did not make any further attempts to get Olson to return to work.  (*Id*.)  Neither Olson nor her attorney contacted BPA again about Olson's return to work.  (*Id*.; Hampton Decl.

¶ 19.)

Olson did not invoice BPA for any work after May 13, 2014.   (*Id.* ¶ 21.)   BPA did not issue any further task orders for Ms. Olson's work after the expiration of her last task order on January 31, 2015.   (*Id.* ¶ 22.)   There was no affirmative decision on this point, there was no reason for BPA to consider whether to issue a new task order because Olson hadn't been to work for many months.   (*Id.*)   The contractual dispute regarding Olson's 2013 and 2014 hourly rate was ultimately resolved by BPA issuing payment to Olson for the amount she claimed she was owed.   (*Id.*)

### D.    Prior Administrative and District Court Proceedings.

On April 29, 2014, Olson contacted a BPA EEO counselor regarding her interest in filing a complaint of discrimination.   In September 2014, Olson filed a formal administrative complaint with the BPA EEO Office and also filed a complaint against MBO with the Oregon Bureau of Labor and Industry.   (Cox Decl. Exs. 3, 4.)   Olson initiated the instant case in U.S. District Court in November 2015.   Olson's initial complaint named only MBO as a defendant and included claims under the FMLA, the Americans with Disabilities Act and the Rehabilitation Act of 1973.   (ECF 1.)

After denying BPA's motion to dismiss Olson's administrative EEO complaint on the ground that she was not a BPA employee, an Administrative Judge with the EEOC dismissed the complaint on the ground that the complaint was "the basis of a pending civil action in a United States District Court in which the complainant is a party."   (Cox Decl., Ex. 4, citing 29 C.F.R. § 1614.107(a)(3)).   On March 13, 2017, Olson filed an amended complaint in this Court which added BPA as a defendant.

**Page 20    Federal Defendants' Motion for Summary Judgment and
              Memorandum in Support**

(ECF 56.)   On June 20, 2017, this Court granted MBO's motion to dismiss all claims against MBO based on an arbitration clause in the GSA signed by Olson and MBO.   (ECF 83.)

## III.    STANDARD OF REVIEW

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The moving party "bears the initial responsibility of . . . identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial.   *Id.* at 324.   "A 'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 252 (1986). "The materiality of a fact is [] determined by the substantive law governing the claim or defense." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.,* 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## IV.    ARGUMENT

Olson asserts three claims for relief in the Amended Complaint.    The first two claims are brought only against MBO.    The Third Claim for relief includes three counts under the FMLA against both MBO and BPA – FMLA interference under 29 U.S.C. § 2615(a)(1), FMLA discrimination under 29 U.S.C. § 2615(a)(2), and FMLA retaliation under 29 U.S.C. § 2615(b).    In all of her FMLA counts, Olson alleges that BPA failed to reinstate her to work after taking leave protected by the FMLA.    (ECF 56, ¶¶ 96, 102, 107.)

"The FMLA creates two interrelated, substantive rights: first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave."    *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001).    "Under [29 U.S.C.] § 2615(a)(1), it is 'unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" the substantive rights guaranteed by FMLA."    *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011) (quoting 29 U.S.C. § 2615(a)(1)).    "When a party alleges a violation of § 2615(a)(1), it is known as an 'interference' or 'entitlement' claim."    *Id.*    "Under [29 U.S.C,] § 2615(a)(2), it is 'unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."    *Id.* (quoting 29 U.S.C. § 2615(a)(2)).    "An allegation of a violation of this section is known as a 'discrimination' or 'retaliation' claim."    *Id.*

Courts in the Ninth Circuit do not apply the *McDonnell Douglas v. Green* burden shifting framework to FMLA interference claims. *See Bachelder,* 259 F.3d at 1125 (citing *McDonnell Douglas v. Green*, 411 U.S. 792 (1993)). Rather, a plaintiff "can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both." To state a prima facie case, the plaintiff "'must establish that (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled.'" *Sanders*, 657 F.3d at 778 (*quoting Burnett v LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)).

Summary judgment in favor of BPA is warranted on all of Olson's claims based on the undisputed material facts for two independent reasons. First, Olson was not a BPA employee, and, therefore, is not entitled to bring a private right of action against BPA. Second, BPA did not terminate Olson's work assignment with BPA.

**A. Olson Was Not a BPA Employee.**

The FMLA provides a private right of action to "any eligible employee" affected by an employer's violation of the FMLA. 29 U.S.C. § 2617(a). Most appointed federal employees are ineligible to bring a private right of action under the FMLA. 29 U.S.C. § 2611(1)(B)(i). Because Olson was not appointed to her position with BPA, she is eligible to bring a private right of action if she can establish she was a BPA employee. However, Olson's claims fail because she was an independent contractor, not an employee of the BPA.

The FMLA adopts the same definition of employee as in the Fair Labor Standards Act ("FLSA").    *See* 29 U.S.C. 2611(3).    "In the case of an individual employed by a public agency," the FLSA defines an employee of a federal agency as "any individual employed by the Government of the United States . . . in any executive agency."    29 U.S.C. § 203(e)(2).    The term "employ" means to suffer or permit to work.    29 U.S.C. § 203(g).

Under the FLSA, "[t]he determination of whether an employer-employee relationship exists does not depend on isolated factors but rather upon the circumstances of the whole activity" and is "to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes."    *Boucher v. Shaw*, 572 F.3d 1087, 1090–91 (9th Cir. 2009) (internal quotations omitted).    "The touchstone is the "economic reality" of the relationship."    *Id.* (*citing Goldberg v. Whitaker House Coop., Inc.,* 366 U.S. 28, 33, (1961)).    As this Court has noted, in determining the existence of an employment relationship for purposes of the FLSA,

> Courts consider the facts as a whole and rely on six factors to analyze the economic realities of the relationship: 1) The degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; and 6) whether the service rendered is an integral part of the alleged employer's business.

*Perez v. Oak Grove Cinemas, Inc.*, 68 F. Supp. 3d 1234, 1242 (D. Or. 2014) (*quoting Donovan v. Sureway Cleaners,* 656 F.2d 1368, 1370 (9th Cir. 1981)).

Under this standard, Olson was not an employee of BPA.   Most importantly, the agency did not control the manner in which Olson performed her work. Individual employees or managers who needed assistance with reasonable accommodation issues would contact Olson directly, and she would schedule time to work with those "clients."   (Hale-Mockley Decl ¶ 5.)   The manager of the RA program, Hale-Mockley, did not provide directions or instructions to Olson.   (*Id.*) If anything, Olson's work is most closely analogized to legal compliance work where her actions were guided by principles of reasonable accommodation.

Other factors also support this conclusion.   The services that Olson rendered required a special skill, as indicated by her education certifications, including a master's degree and a certification in rehabilitation counseling.   Furthermore, the lack of permanence in the working relationship is indicated in the contractual documents, which provided that Olson was engaged to perform tasks on an "assignment-by-assignment basis"; that BPA "is free to select [Olson], or not, for any assignment"; and that "assignment end dates may be ended at the sole discretion o[f] BPA, at any time."   (ECF 18; Hampton Decl., Ex. 1 at p. 52; Ex. 3.

## B. BPA Did Not Willfully Violate Olson's FMLA Rights.

### 1.   Olson Must Establish that any FMLA Violation Was Willful.

The FMLA is generally a strict liability statute, *i.e.*, "the employer's intent is irrelevant to a determination of liability." *Sanders*, 657 F.3d at 778.   However, the FMLA also permits a claim for a willful violation of FMLA rights.   Distinguishing between a strict liability and willful claim can be important at summary judgment due to a difference in the statute of limitations.   The statute of limitations is only

two years for a strict liability claim, but is three years for a willful claim.   *See* 29

U.S.C. § 2617(c)(1); 29 U.S.C. § 2617(c)(2) ("In the case of such action brought for a

willful violation of section 2615 of this title, such action may be brought within 3

years of the date of the last event constituting the alleged violation for which such

action is brought.").

That difference is important here because the timing of Olson's Amended

Complaint precludes Olson from bringing a strict liability FMLA claim against

BPA.   The last event on which Olson's claims against BPA could be based is the

expiration of her contract to work at BPA on January 31, 2015.   (Hampton Decl.,

Ex. 3.)   Olson did not assert an FMLA claim against BPA until she filed her

amended complaint in this action on March 13, 2017.   (ECF 56.)   Thus, because

the amended complaint was filed more than two years after her contract to work at

BPA ended, Olson must demonstrate BPA committed a willful violation of the

FMLA in order to prevail on her claims.

### 2.   Olson Rejected BPA's Invitation to Return to Work.

Where, as here, an employee claims that she was terminated for taking

FMLA-protected leave, the question is "whether there is a triable issue of material

fact as to whether the FMLA leave taken by [the plaintiff] was impermissibly

considered as a factor in her termination."   *Xin Liu v. Amway Corp.*, 347 F.3d 1125,

1136 (9th Cir. 2003).   Assuming for purposes of summary judgment that some of

Olson's absences from work from March through June of 2014 were protected by the

FMLA, Olson cannot prevail on her interference claim because it is undisputed that

BPA did not terminate her position.   Rather, BPA continued to welcome her back

**Page 26   Federal Defendants' Motion for Summary Judgment and**
**            Memorandum in Support**

to work during and after her absences, yet she never availed herself of the
opportunity to return to work.   (Hampton Decl. ¶¶ 9, 13-18, Exs. 12, 13, 15; Hale-
Mockley Decl. ¶¶ 20, 22, 23; Carter Decl. ¶ 7.)   Under these circumstances,
summary judgment is appropriate.   *See James v. Hyatt Regency Chicago*, 707 F.3d
775, 782 (7th Cir. 2013) (holding that summary judgment was appropriate when the
employer "attempted on multiple occasions to return [plaintiff] to work").

Olson seems to contend that the offer to return to work was not genuine
because (1) BPA transferred the RAC position to a federal employee while Olson
was out on leave, (2) Hale-Mockley prohibited her from doing work remotely when
she was on leave, and (3) BPA cut off Olson's access to the BPA network and facility
during her extended absence.   But Olson's failure to even attempt to return to work
precludes her from making any arguments about whether BPA's offer to return to
work was genuine.   See *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 252 (6th
Cir. 2004) ("Plaintiff complains that she was not returned to a job with the same
hours and pay, but understates the importance of the option she always possessed
to resume working full time under the [gradual return to work] program.   By
providing Plaintiff with the option to return to full-time work (with her own
physician's approval), Honda placed the key in Plaintiff's hand, and thus provided
Plaintiff with an equivalent position under 29 C.F.R. § 825.215(a).").   In any event,
none of the events cited by Olson support an inference that BPA willfully
terminated Olson's work assignment at BPA.

### a. The transfer of the RAC position did not end Olson's work assignment.

Olson's FMLA interference claim is unavailing to the extent it is based on BPA's decision to transfer the RAC role to a federal employee during Olson's absence.   This is so for four reasons.   First, the FMLA does not entitle employees to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."   29 U.S.C. § 2614(a)(3)(B).   Under the terms of her contractual relationship, BPA had the sole right to determine the nature of the assignments Olson performed.   Thus, Olson did not have any entitlement to determine what assignments she performed on her return.

Second, BPA's decision to transfer the RAC duties to a federal employee did not change the nature of the work that Olson would be performing upon her return to work.   The BPA managers were still committed to providing Olson with substantive work within her area of expertise in the reasonable accommodation field upon her return to work.   (Hale-Mockley Decl. ¶¶ 20-22; Carter Decl. ¶ 7.)

Third, in her meeting with Hampton on June 5, 2014, Olson was still not sure she could return to work after having been out of the office for 12 weeks (which is the maximum entitlement to FMLA leave).   Olson requested a five hour trial period to see if she could work.   Under such circumstances, BPA was entitled to have another employee fill Olson's position.   *See Johnson v. Houston's Rest. Inc.*, 167 F. App'x 393, 396 (5th Cir. 2006) (holding employer did not violate the FMLA by refusing to reinstate plaintiff, since he was physically incapable of performing the

duties previously required of him).

Fourth, even if the loss of the mere title of "reasonable accommodation coordinator" could somehow be construed as an actionable failure to restore Olson to an equivalent position (which Defendants deny), it is not sufficient to support a claim for willful interference, which Olson must show.   Demonstrating a willful violation of the FMLA requires a plaintiff to provide evidence that the employer "'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'"   *Hollowell v. Kaiser Found. Health Plan of the Nw.*, No. 14-35882, 2017 WL 2839500, at *1 (9th Cir. July 3, 2017) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).   Furthermore, "even if some *intent* to avoid the FMLA's consequences is evidenced—a finding of willfulness will not necessarily follow where the employer tried to comport with the law and tenable reasoning undergirded its conduct."   *Bass v. Potter*, 522 F.3d 1098, 1104 (10th Cir. 2008) (emphasis in original).

Under similar circumstances, courts have held that such a change in job duties or title cannot constitute a willful violation of the FMLA.   *See Hanger v. Lake Cty.*, 390 F.3d 579, 583 (8th Cir. 2004) (holding there was no willful violation of the FMLA when the plaintiff was restored to work but "was no longer considered the head of the human resources department; [] lost control over the department's budget, had to submit time sheets to Ms. Parkinson, and no longer reported directly to the Board of Commissioners"); *Hillstrom v. Best W. TLC Hotel*, 354 F.3d 27, 29 (1st Cir. 2003) (holding no willful violation of the FMLA when the plaintiff was

restored to work but "no longer reported directly to upper management, . . . was relegated to a smaller office and his title was changed").

The absence of intent is particularly striking here because of (1) the BPA managers' belief that the FMLA did not apply to Olson because she was not a BPA employee (even if that belief may have been incorrect), (2) the BPA managers' efforts to consult with counsel to comply with their legal obligations, (3) BPA's pre-existing decision to transition the RAC duty to a federal employee in a few months, and (4) BPA's efforts to have Olson return to work.  *See Hoffman v. Professional Med Team*, 394 F.3d 414 (6th Cir. 2005) (holding no willful violation when the employee's manager consulted with counsel in good faith effort to meet obligations).

### b.  BPA's requirement that Olson come back to the office in order to resume working does not mean her work assignment was terminated.

Hale-Mockley's instruction that Olson not perform work while out on leave also does not suggest that BPA terminated Olson's work assignment.   BPA paid Olson for all of the time that she worked remotely while she was simultaneously claiming to be out on leave.   (Hampton Decl. ¶ 21.)   To the extent Olson felt she wasn't able to work anymore due to Hale-Mockley's instruction, that feeling is insufficient to support a failure to reinstate claim for several reasons.

First, if Olson is contending she was out on FMLA during that time, then she cannot also claim that she wanted to work during that time under conditions that she prescribed for herself, i.e., teleworking.  *See James* 707 F.3d at 781 (noting that "[t]here is no such thing as FMLA light duty").

Second, BPA was well within its rights to require Olson to return to the office

in order to resume work.   Hale-Mockley did not want Olson performing sporadic work remotely while she was considering herself out of the office because it would be confusing to have two different individuals "taking point" with clients regarding RA issues.   (Hale-Mockley Decl. ¶ 22.)   That could result in clients receiving conflicting information about their cases, which was an issue BPA had experienced in the past.   (*Id.*)   Also, if Olson was able to work, Hale-Mockley thought it was important for Olson to first come back to the office and meet with Hampton and Hale-Mockley to discuss the nature of her job going forward due to her extended absence from work, her request for changes in her job, and the plan to transition the RAC duty to Riffel.   (*Id.*)

Finally, once Olson did return to the office and meet with Hampton, Hampton agreed with Olson's requests that (1) her time in the office be limited to a five hour trial period and (2) she be allowed to telework, except for any meetings or tasks that needed to be performed onsite.   (Hampton Decl. ¶ 18.)   Thus, BPA was actually quite generous about the telework issue and met all of Olson's demands on that point.

### c.   BPA's decision to cut off Olson's access to the BPA network during her extended absence does not indicate her work assignment was terminated.

Lastly, BPA's decision to cut off Olson's access to the BPA network due to her extended absence also does not indicate that BPA would not allow Olson to return to work.   Olson's access to the BPA network was revoked as a security precaution based on Olson's extended absence from work.   (Hampton Decl., Ex. 11.)   An employer is certainly entitled to take such steps until an employee returns to work.

In any event, the key point is that Olson never returned to work, despite BPA

having taken steps to reestablish her access to the network.   (*Id.*, Ex. 14.).

## V.    CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the

Court grant Federal Defendant's motion for summary judgment and dismiss Olson's

Amended Complaint with prejudice.

Dated this 4th day of December 2017.

Respectfully Submitted,

BILLY J. WILLIAMS
United States Attorney
District of Oregon

*/s/ James E. Cox, Jr.*
JAMES E. COX, JR.
Assistant United States Attorney
        Attorneys for Federal Defendants