IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


ANDREA OLSON,

                    Plaintiff,

        v.

UNITED STATES OF AMERICA, by
and through the Department of Energy
and Bonneville Power Administration;
and JAMES RICHARD PERRY,
Secretary of the Department of Energy,

                    Defendants.

No. 3:15-cv-02216-HZ

OPINION & ORDER


David H. Griggs
GRIGGS LAW GROUP, P.C.
4900 SW Griffith Dr., Ste. 165
Beaverton, OR 97005

        Attorney for Plaintiff

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon
James E. Cox, Jr.
ASSISTANT UNITED STATES ATTORNEY
1000 SW Third Ave., Suite 600
Portland, Oregon 97204

        Attorneys for Defendants

HERNÁNDEZ, District Judge:

Plaintiff Andrea Olson brings this case against Defendants United States of America, by and through the Department of Energy and Bonneville Power Administration, and James Richard Perry, Secretary of the Department of Energy. Plaintiff brings three separate claims under the Family and Medical Leave Act of 1993: (1) interference under 29 U.S.C. § 2615(a)(1); (2) retaliation under 29 U.S.C. § 2615(b); and (3) retaliation under 29 U.S.C. § 2615(a)(2). Defendants move for summary judgment against Plaintiff on all three claims. For the reasons that follow, the Court denies Defendants' motion.

## BACKGROUND

### I.     Plaintiff's Working Relationship with Defendants

Defendant Bonneville Power Administration ("BPA") is a self-funded nonprofit federal power marketing administration that is part of the U.S. Department of Energy. Cox Decl. Ex. 1, ECF 98. In early 2010, Defendants entered into a contract with Plaintiff, through her company Pacific Disability Management, to provide reasonable accommodation services to its workforce. Hale-Mockley Decl. ¶¶ 2–3, ECF 95. Defendants' initial contract with Plaintiff was for one year with four unilateral annual renewal options for BPA to extend the contract between 2011 and 2014. *Id.* at Ex 1 at 5. Under the terms of this contract, Plaintiff served as the reasonable accommodation coordinator ["RAC"] for Defendants in 2010 and 2011. *See id.* at ¶¶ 3–4.

In 2011, Defendants declined to exercise their second option year and instead, for tax purposes, required Plaintiff to work for BPA through a Master Services Agreement ["MSA"] that BPA had with MBO Partners, a payroll service provider for certain BPA independent

contractors.[1] Hampton Decl. ¶ 2, ECF 96. Plaintiff accordingly entered into a General Service

Agreement ["GSA"] with MBO Partners on January 10, 2012, Baxter Decl. Ex. 1 ("GSA"), ECF

18, and performed work for Defendants under the provisions of the MSA and GSA. *Id.* at ¶¶ 2–3.

Both documents provided that work would be done "on an assignment-by-assignment" basis and

that both parties could decline or accept an assignment, or not. GSA at 2; Hampton Decl. Ex. 1 at

52. Each task order specified that "[a]ssignment end dates do not obligate BPA to retain the

Contract Worker or position through the dates listed; assignment end dates may be ended at the

sole discretion of BPA, at any time." Hampton Decl. ¶ 4, Ex. 3. "The scope of [Plaintiff's] work

under the MSA was determined by a job posting which became an assignment under the MSA."

*Id.* at ¶ 3. Attached to the job assignment was a document titled "Additional Position

Information" that described Plaintiff's duties as the RAC. *Id.* at ¶ 3, Ex. 2.

The parties dispute the exact nature of the working relationship between Defendants and

Plaintiff. Sharon Hale-Mockley is the manager who oversaw the reasonable accommodation

program at the time Plaintiff worked for Defendants. Hale-Mockley Decl. ¶ 1. Ms. Hale-

Mockley states that she did not consider Plaintiff to be an employee. *Id.* at ¶ 5. Rather, Ms. Hale-

Mockley alleges that Plaintiff worked "in a largely independent manner without supervision." *Id.*

She did not assign Plaintiff work. *Id.* Instead, Plaintiff worked directly with employees and

managers at BPA who needed assistance with reasonable accommodation issues. *Id.* Plaintiff

was allowed to set her own hours and, other than attending staff meetings to coordinate services,

decide whether to work at BPA or remotely. *Id.* at ¶ 6. She says that she "did not provide

[Plaintiff] with any performance reviews, evaluate her work, or provide or suggest professional

resources to train her." *Id.* at ¶ 5. Plaintiff did not have to request time off, scheduled and paid

---

[1] Plaintiff also brought claims against MBO Partners, Inc., but these claims were dismissed by this Court because they were subject to an arbitration agreement between Plaintiff and MBO Partners. See Opinion & Order, June 15, 2017, ECF 83.

for her own training and travel, and provided her own cell phone, which Ms. Hale-Mockley states "was a critical piece of equipment for [Plaintiff] to perform her function because she frequently worked out of the office." *Id.* at ¶¶ 6–7. She also asserts that the RAC position requires expert services that Plaintiff, through her qualifications and certifications, was able to provide. *Id.* at ¶ 5. Plaintiff copied Ms. Hale-Mockley on correspondence for record-keeping purposes and to permit Ms. Hale-Mockley to follow-up on client cases if Plaintiff was out of the office. *Id.* at ¶ 8. Ms. Hale-Mockley also assisted Plaintiff with conflict resolution when she had issues with co-workers. *Id.* at ¶ 10.

Plaintiff, by contrast, alleges that when she was the RAC for Defendants she was "under the direction of Sharon Hale-Mockley." Olson Decl. ¶ 4. She states that her ability to work from home occasionally was consistent with that of her peers who were BPA employees. *Id.* at ¶ 7. She also states that she worked on BPA's premises and reported to Ms. Hale-Mockley as her superior. *Id.* Defendants sent work orders for her services through MBO, but she worked as the RAC solely for Defendants. *Id.* at ¶ 6. She also states that Defendants provided her with both a computer and an email address. *Id.* at ¶ 7. Plaintiff alleges that she did not solicit work outside of the work she performed for Defendants "because she was working full time meeting the work requests and reporting requirements of BPA and MBO." Am. Compl. ¶ 19;[2] *see also id.* at ¶ 26 (indicating that the RAC position was her "only occupation and source of income.").

## II.   Plaintiff's Initial Leave

In 2013, Defendants began reconsidering its personnel practices in the wake of a public scandal regarding problems with its human resources department and its hiring process. Carter

---

[2] In Plaintiff's Declaration attached to Plaintiff's Response to the Motion for Summary Judgment, Plaintiff incorporates all the factual allegations from paragraphs 10 through 63 in her Amended Complaint. Olson Decl. ¶ 1. As Defendants do not object, the Court has accordingly incorporated all the factual allegations from the Amended Complaint into Plaintiff's Declaration for the purposes of this motion.

Decl. ¶ 2–3, ECF 97. As part of this project, Defendants undertook a major overhaul of the human resources department. *Id.* at ¶ 3, Ex. 2 at 4, 15. This included a reduction in the number of outside contractors, like Plaintiff, relied on by Defendants' Human Capital Management ("HCM") workforce. *Id.* at ¶4. As a result, "from 2013-2017, the number of contractors in HCM shrank from 40 to 23." Hampton Decl. ¶ 22. Ultimately, Defendants decided that Plaintiff's position—RAC—should be reassigned to a federal employee because the RAC is required to handle sensitive employee information (including medical records), advises managers and represents the agency before adjudicative bodies, and obtains assistive devices for employees, which ultimately involves determinations about the expenditure of agency funds. Carter Decl. ¶ 5. However, the reassignment of this position did not occur immediately because Defendants had existing contractual obligations with Plaintiff. *Id.* at ¶ 6.

The relationship between Plaintiff and Defendants began to deteriorate in 2014. Early that year, Plaintiff contacted MBO to request three changes in her work process with BPA: "(1) Telework to reduce time onsite except for meetings and tasks that needed to be performed onsite; (2) Decisions that need to be made by the BPA Reasonable Accommodation Program Manager, Sharon Hale-Mockley, to be provided via email (in reply to decision request) within a specified time frame (deemed 'reasonable' by the BPA Reasonable Accommodation Program Manager; and (3) Open communication with the DOE reasonable accommodation coordinator for guidance and best practices." Hampton Decl. Ex. 4. MBO notified Defendants, through BPA's Supplemental Labor Management Office ("SLMO"), of these requests on Thursday March 13, 2014. *Id.* ¶ 6. Scott Hampton, manager of the SLMO, then decided to meet with both Plaintiff and Ms. Hale-Mockley to discuss Plaintiff's requests. *Id.* at ¶¶ 1, 6.

Before this meeting could take place, Plaintiff went on her first extended absence on March 17, 2014. *Id.* Plaintiff notified Ms. Hale-Mockley that she would not be working through March 21 without further explanation. Hale-Mockley Decl. ¶ 11, Ex. 2. On March 21, Plaintiff again informed Ms. Hale-Mockley that she was not going to work the following week. *Id.* at ¶ 12, Ex. 3. On March 24, Plaintiff indicated to Ms. Hale-Mockley that her recent absences were "for a medical reason." *Id.* at Ex. 6. "During this period, [Plaintiff] referred BPA employees with reasonable accommodation requests or issues to Hale-Mockley." *Id.* at ¶ 13, Exs. 4, 5. While managers involved in Plaintiff's case contend that they had no prior knowledge of any medical conditions that would require Plaintiff to miss work, Hampton Decl. ¶ 16; Hale-Mockley Decl. ¶ 14, Plaintiff asserts that she first notified BPA management that she suffered from anxiety in February of 2014, Olson Decl. ¶ 8.

**III.     Defendants transfer the RAC Position**

Because Plaintiff had been absent for two weeks, Ms. Hale-Mockley informed Mr. Hampton that Plaintiff's absence was due to a medical reason and suggested that they meet with Plaintiff to determine whether she would be able to continue her work with Defendants in the future. Hale-Mockley Decl. at ¶ 15; Hampton Decl. Ex. 6. At that point, Mr. Hampton asked Ms. Hale-Mockley to consider releasing Plaintiff from her contract because she had recently expressed frustration with her contract with BPA and had made requests to change her work conditions. Hampton Decl. ¶ 9.

Ms. Hale-Mockley scheduled a meeting with Plaintiff for April 1, but Plaintiff did not return to work that week. Hale-Mockley Decl. ¶ 17. And on April 3, Plaintiff informed Ms. Hale-Mockley that she would be out of the office the following two weeks. *Id.* at ¶ 18. At that point, Plaintiff had been out of the office for a total of five weeks. *Id.*

On April 4, Ms. Hale-Mockley met with Brian Carter, the director of HR, to discuss the reasonable accommodation program. *Id.* at ¶¶ 18, 20; Carter Decl. ¶ 1. Ms. Hale-Mockley was concerned about how Defendants were going to handle reasonable accommodation requests while Plaintiff was out of the office. Hale-Mockley Decl. ¶ 20; Carter Decl. ¶ 7. Ms. Hale-Mockley requested that an existing federal employee, Susan Riffel, be assigned the RAC position. *Id.* Plaintiff had already requested that Ms. Riffel help her with reasonable accommodation issues while she was absent. Hale-Mockley Decl. Ex. 11. Mr. Carter agreed that Ms. Riffel should take over the position. *Id.* at ¶ 20. Upon return from her absence, Mr. Carter and Ms. Hale-Mockley decided that Plaintiff would "continue to work through the end of her contract by helping transition Ms. Riffel into the RAC role" and by providing substantive work within her area of expertise in the RA field. Carter Decl. ¶ 7; Hale-Mockley Decl. ¶¶ 20–21. Ms. Riffel was formally assigned the RAC position on April 14, 2014. Hale-Mockley Decl. ¶ 21, Ex. 10.

During this time, Mr. Hampton also emailed an account manager at MBO Partners to find out whether MBO had any information regarding Plaintiff's absence and whether she was claiming medical disability. Hampton Decl. ¶ 10, Ex. 7. The account manager responded that MBO could not share any medical information with BPA and that she had no information regarding Plaintiff's absence. *Id.* However, without informing Defendants, on March 25, Plaintiff had sent a Department of Labor Form to MBO certifying that she had a serious medical condition for the purposes of FMLA. Cox Decl. Ex. 2; Olson Decl. ¶ 8–9 (indicating that she had requested FMLA leave through MBO in March of 2014). At some point during Plaintiff's absence both Ms. Hale-Mockley and Mr. Hampton learned about Plaintiff's request for FMLA.

Hale-Mockley Decl. ¶ 24 (stating she found out "sometime during her absences"); Hampton Decl. ¶ 16 (indicating he found out about her application in early May).

In his email to MBO, Mr. Hampton also informed MBO that Defendants would likely be terminating Plaintiff's contract, though the decision had not yet been made. Hampton Decl. ¶ 10, Ex. 7. However, "BPA did not terminate the contract because—after consultation with a BPA attorney and in an effort to ensure that BPA met its legal obligations with respect to [Plaintiff]— Hampton determined that BPA did not have enough information to make the decision until [Plaintiff] returned to work and he had a chance to discuss the working relationship with her." Defs. Mot. Summ. J. 18 (citing Hampton Decl. ¶ 10).

On April 27, Plaintiff submitted an invoice to BPA for 2.1 hours of work performed at home that day. Hale-Mockley Decl. ¶ 23, Ex. 12. Ms. Hale-Mockley responded by reminding Plaintiff that she did not want or expect her to work while Plaintiff was out of the office. *Id.* Ms. Hale-Mockley states that she did so in order to avoid confusion with clients seeking assistance from both Ms. Riffel and Plaintiff. *Id.* Ms. Hale-Mockley also states that she believed Plaintiff should discuss the nature of her job going forward, Plaintiff's earlier request for changes in her position, and the plan to transition the RAC position to Ms. Riffel before returning to work. *Id.* Plaintiff responded to Ms. Hale-Mockley's message stating "I do not believe I have stated that I am unable to perform any work" and that "as an independent contractor it is my judgment and decision when I work." *Id.*

On April 29, Plaintiff contacted a BPA EEO counselor indicating that she was interested in filing a complaint of discrimination. Am. Compl. ¶ 55. The next day, Plaintiff received two emails from SLMO. Hampton. Decl. ¶ 12, Exs. 9–11. The first email indicated that Plaintiff was terminated. *Id.* at Ex. 9. The SLMO employee who sent the email subsequently recalled it and

sent another email informing Plaintiff that her "access to the BPA network and property is being revoked as per security regulations that require revocation of access for anyone away longer than a month." *Id.* at ¶ 12, Ex. 10–11. Mr. Hampton also sent an email to Plaintiff confirming that the initial email terminating her employment had been sent in error and that her access was only being suspended because she had been absent for over a month. *Id.* at ¶ 13, Ex. 12. He also indicated that Defendants anticipated her return to work. *Id.*

At the end of May, Plaintiff submitted a time sheet to Mr. Hampton for a half hour of work she had performed. Hampton Decl. Ex. 13 at 5. At that time, Plaintiff requested network access in order to attempt to telework and indicated that she has "been able to perform some work." *Id.* at 3–4. Mr. Hampton requested that Plaintiff meet with him at BPA before working to discuss her accommodations. *Id.* at 3, 5. Plaintiff asked Mr. Hampton whether she was correct in her understanding that Defendants had filled the RAC position with another employee and that they wanted her onsite to train the new RAC. *Id.* at 3. Mr. Hampton confirmed that Defendants had planned to transition the RAC position to a federal employee and that they desired "transition time with that worker." *Id.* at 1. Plaintiff then agreed to meet with Mr. Hampton and requested that an EEO counselor be present at their meeting. *Id.* at 1.

On June 5, Mr. Hampton met with Plaintiff at EEO counselor's office to discuss her return to work and the three requests she had made in March. *Id.* at ¶ 18, Ex. 15. Plaintiff requested a five-hour trial work period to determine whether she could work the same amount of time she had been working previously. *Id.* Mr. Hampton agreed with Plaintiff's request and asked that she follow up with Ms. Hale-Mockley to coordinate her trial work period. *Id.* On June 11, 2014, Mr. Hampton followed up with Plaintiff and confirmed that they had agreed to most of Plaintiff's accommodation requests from earlier that year, including her desire to telework. *Id.* at

Ex. 15. He also indicated that Defendants wanted Plaintiff "to return to her regular work schedule to assist with creating Reasonable Accommodation resources for the BPA employee who [was] assuming the Reasonable Accommodation Coordinator workload" and that Ms. Hale-Mockley would provide her with a "detailed transition plan." *Id.* However, when Plaintiff contacted Ms. Hale-Mockley a day later, she informed her that her "attorney will be in contact with a BPA attorney soon." Hale-Mockley Decl. ¶ 25, Ex. 13. Ms. Hale-Mockley interpreted this as requesting the parties to go through her attorney from that point forward on any issue regarding Plaintiff's return to work and accordingly did not make any future attempt to get Plaintiff to return to work. *Id.* But neither Plaintiff nor her attorney ever contacted Ms. Hale-Mockley about her trial work period. *Id.*; Hampton Decl. ¶ 19. After this time, Plaintiff did not perform any work for Defendants, and Defendants did not issue an additional work order for Plaintiff. Hampton Decl. ¶¶ 21–22.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th

Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (internal quotation marks omitted); *see also Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985) ("Even where the basic facts are stipulated, if the parties dispute what inferences should be drawn from them, summary judgment is improper.").

## DISCUSSION

Plaintiff alleges that Defendants violated the Family and Medical Leave Act ("FMLA") by retaliating against her for opposing Defendants unlawful FMLA practices and interfering with her rights under the FMLA. Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims because (1) Plaintiff was not an employee of Defendants and, therefore, was not entitled to FMLA protections; and, (2) assuming Plaintiff is an employee, Plaintiff cannot show that Defendants willfully violated Plaintiff's rights under the FMLA.

## I.      Whether Plaintiff was Defendants' Employee

Defendants first argue that summary judgment in their favor is warranted on all of Plaintiff's claims because Plaintiff was an independent contractor—not an employee—of Defendants. Defs. Mot. Summ. J. 23.  Defendants argue that the Court should apply the economic realities test to determine whether there is an employment relationship between the parties. *Id.* In response, Plaintiff points to the Department of Labor's joint employer regulation in arguing that Plaintiff is an employee for the purposes of the FMLA. Pl. Resp. Mot. Summ J. 3, ECF 109.

Where, as here, there is no dispute of material fact regarding employment, whether the plaintiff is an employee is a question of law for the Court. *See Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997) ("Whether an entity is a 'joint employer' under the FLSA and AWPA is a question of law."); *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1468–69 (9th Cir. 1983)*, overruled on other grounds, Garcia v. San Antonio Metro. Transit. Auth.*, 469 U.S. 528, 538 (1985) ("Although the underlying facts are reviewed under the clearly erroneous standard, the legal effect of those facts—whether appellants are employers within the meaning of the FLSA—is a question of law."); *see also Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12-cv-00824 JWS, 2015 WL 1299369, at *2 (D. Ariz. March 23, 2015) ("Whether an individual is an employee or an independent contractor for purposes of the FLSA is a question of law."). Neither party has provided the Court with any justification for why only one or both tests should be applied to this case. [3] Under either test, however, the outcome is the same: Plaintiff is an employee of Defendants for the purposes of the FMLA.

---

[3] Indeed, there is contradictory non-binding case law regarding how these tests intersect. *Compare Chao v. Westside Drywall, Inc.*, 709 F.Supp.2d 1037, 1061 (D. Or. 2010) (applying both tests simultaneously) *with Hall v. DIRECTV, LLC*, 846 F.3d 757, 767 (4th Cir. 2017) (indicating that the joint employer regulation is applied first and the

A.    Economic Realities Test

The FMLA only provides a private right of action to "any eligible employee" impacted

by their employer's violation of the FMLA. 29 U.S.C. § 2617(a). It appears that the Ninth Circuit

has not addressed what the proper test is for determining whether an individual is an employee or

an independent contractor under the FMLA. Defendants persuasively argue that the Court should

look to the economic realities test applied in cases arising under the Fair Labor Standards Act

("FLSA"). Defs. Mot. Summ. J. 24; *see also Collinge v. Intelliquick Delivery, Inc.*, No. 2:12-cv-

00824 JWS, 2015 WL 1292444, at *12 (D. Ariz. Mar. 23, 2015) (applying the economic realities

test to the FMLA); *Bonzai v. Shinskei*, 895 F.Supp.2d 1003, 1009–10 (E.D. Cal. 2012) (citing

other circuits and finding that "the similarity between FMLA and FLSA suggests that Congress

intended the statutes to be treated the same," at least insofar as they define "employer"). The

FMLA states that "[t]he terms 'employ' [and] 'employee' . . . have the same meanings given to

such terms in subsections … (e) and (g) of section 203 of this title," or the FLSA. 29 U.S.C.

§ 2611(3). The FLSA in turn defines an employee of a federal agency as "any individual

employed by the Government of the United States . . . in any executive agency" and states that

"'employ' includes to suffer or permit to work." 29 U.S.C. § 203(e), (g).

As the Supreme Court has observed, the FLSA's definition of "employee" is "the

broadest definition that has ever been included in any one act." *United States v. Rosenwasser*,

323 U.S. 360, 363 n.3 (1945); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326

(1992) (emphasizing the FLSA's expansive definition of "employ" which "cover[s] some parties

who might not qualify as such under a strict application of traditional agency law principles").

Accordingly, "[n]either the common law concepts of 'employee' and 'independent contractor'

economic realities test second and with regard to both employers). Because the outcome is the same under both
tests, however, the Court need not reach this issue.

nor contractual provisions purporting to describe the relationship are determinative of employment status." *Nash v. Resources, Inc.*, 982 F. Supp. 1427, 1433 (D. Or. 1997) (citing *Real v. Driscoll Strawberry Assocs.*, 603 F.2d 748, 754–55 (9th Cir. 1979)).

The Ninth Circuit has, therefore, applied the "economic realities test" to determine whether an employee-employer relationship exists. *Real*, 603 F.2d at 754–55. In applying the test, courts typically look to the following list of non-exhaustive factors:

(1) the degree of the alleged employer's right to control the manner in which the work is performed;
(2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
(3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;
(4) whether the service rendered requires a special skill;
(5) the degree of permanence of the working relationship; and
(6) whether the service rendered is an integral part of the alleged employer's business.

*Id.* at 754. "The presence of any individual factor is not dispositive of whether an employee/employer relationship exists." *Id.* Instead, the existence of such a relationship "'depends upon the circumstances of the whole activity.'" *Id.* at 754–55 (quoting *Rutherford Food Corp v. McComb*, 331 U.S. 722, 730 (1947)).

In *Mathis v. Housing Authority of Umatilla County*, the district court applied the economic realities test in finding that the plaintiff was an employee under the FLSA. 242 F.Supp.2d 777, 782 (D.Or. 2002). There, the plaintiff was hired as an independent contractor to fill the role of Section 8 Coordinator for the defendant, a county housing authority. *Id.* at 781. Because the plaintiff was "dependent on [the defendant] for her sole source of income, worked at [the defendant's] office, and was subject to the executive director's direction . . . . the degree of control tip[ped] toward an employee relationship." *Id.* at 784. The plaintiff did not have any opportunity for profit or loss because she was paid hourly and did not engage in any other activities associated with an independent business. *Id.* She made no investment in equipment or

materials for her work and rendered services and worked in a manner similar to other employees. *Id.* at 784–85. Her position as Section 8 Coordinator was to last for an indefinite duration and was terminable by either party at any time *Id.* at 785. Further, the court found that the plaintiff did not use any special skills "in any independent way" because "her work and client contacts took place at [the defendant's office] during its normal business hours." *Id.* at 784. Finally, while the court found that the plaintiff had explicitly indicated to the defendant her desire to be an independent contractor, it also emphasized that "intent 'cannot override the economic realities'" of the relationship. *Id.* at 785 (citing *Real*, 603 F.2d at 755). As all the other factors indicated that the plaintiff was an employee, the court determined that "the issue of [the plaintiff's] desire to be an independent contractor does not alter the economic reality that she was an employee of [the defendant]." *Id.* at 786.

Taking each element in turn, the Court finds that Defendants are not entitled to judgment as a matter of law on Plaintiff's status as an independent contractor. While the factual record on Plaintiff's everyday working relationship is light, and the parties fail to address all the factors set out in *Real*, the economic realities of the employment relationship indicate that Plaintiff was an employee of Defendants under the FMLA.

i.    Control

An employee need not be supervised at all times in order for an employer to "control" their work. *See Chao v. Westside Drywall, Inc.,* 709 F. Supp. 2d 1037, 1064 (D. Or. 2010), *as amended* (May 13, 2010) ("The fact that the laborers are not supervised in detail at all times does not necessarily mean they are not 'employees.'"). "'Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a

separate economic entity.'" *Mathis*, 242 F.Supp.2d at 783 (quoting *Usery v. Pilgrim Equip. Co.*, Inc., 527 F.2d 1308, 1312-13 (5th Cir. 1976)).

In their briefing, the parties dispute whether Defendants controlled the manner in which Plaintiff performed her work. Ms. Hale-Mockley oversaw the reasonable accommodations program, but she did not provide feedback or assignments to Plaintiff. Hale-Mockley Decl. ¶ 5. Individual employees worked directly with Plaintiff, and Plaintiff worked "in a largely independent manner without supervision." *Id.* Plaintiff copied Ms. Hale-Mockley on all her correspondence, but only for record-keeping purposes. *Id.* at ¶ 8.

Generally, Plaintiff was able to set her own hours, did not have to request time off, could work from home, and paid for her own travel and training. *Id.* at ¶ 6–7. But Plaintiff alleges it was not atypical for other BPA employees to also occasionally work from home. Olson Decl. ¶ 7. Plaintiff also attended staff meetings, Hale-Mockley Decl. ¶ 5; Olson Decl. ¶ 7, and the record suggests that Plaintiff did not have complete control over where she worked as she had to request permission from Defendants to telework full-time, Hampton Decl. Ex. 4. Plaintiff was also dependent on Defendants as her sole source of income. Am. Compl. ¶¶ 19, 26. The job posting and task orders describing Plaintiff's work for Defendants indicated that the RAC was expected to work forty hours per week, Hampton Decl. Exs. 2–3 (describing the position as eight hours per day or forty hours per week), and Plaintiff alleges that she did work for Defendants full time. Am. Compl. ¶ 19. Defendants also determined her hourly rate of pay. Hampton Decl. Ex. 5 at 3 (directing Plaintiff to contact Defendants to request an increase in her rate).

While Ms. Hale-Mockley may not have believed Plaintiff was an employee or reviewed or assigned her work, the evidence generally shows that Defendants exerted significant control over Plaintiff with regard to the time, manner, and place of her work. Plaintiff worked for

Defendants approximately full-time, attended staff meetings, and used their offices in order to conduct her work. While Plaintiff may have been able to work remotely at times, the evidence shows that this was consistent with the manner of work of other employees. Further, the fact that Plaintiff had to request permission from Defendants in order to telework full time suggests that Defendants had significant control over both the manner and location of her work. Accordingly, this factor weighs in favor of an employment relationship. *See Murphy v. Tuality Healthcare*, 157 F.Supp.3d 921, 926 (D.Or. 2016) (where the defendants "exercised a great deal of control over [the plaintiff's] work schedule," required the plaintiff to work full time at least 42 weeks in the year, required the plaintiff to get permission to adjust his schedule, and required the plaintiff to attend staff meetings, "[t]his factor weigh[ed] "in favor of finding an employee relationship").

ii.     Opportunity for Profit or Loss

Neither party addresses this factor in their briefing, but the evidence suggests that Plaintiff did not have any opportunity for profit or loss. Plaintiff was not responsible for billing individual clients who received reasonable accommodation services and collecting payment. She could not charge whatever she chose. She does not appear to have had any opportunity for a commission or bonus. *See Murphy*, 157 F.Supp.3d at 927 (emphasizing that the plaintiff billed patients for his services and collected payments but had no control over what he chose to charge); *Chao*, 709 F.Supp.2d at 1065 ("Where workers are paid fixed hourly wages with no opportunity for commission or bonus, this weighs in favor of employee status."). As in *Mathis*, Plaintiff here was paid a fixed hourly rate, and, therefore "had no opportunity for profit or loss other than by charging [Defendants] for the number of hours that she worked." 242 F.Supp.2d at 784; *see* Am. Compl. ¶¶ 16–17 (alleging Plaintiff was paid on an hourly basis and she submitted invoices to Defendant BPA). This factor weighs in favor of employee status.

iii.    Special Skills

Defendants allege that "the services that [Plaintiff] rendered required a special skill, as indicated by her education certifications, including a master's degree and certification in rehabilitation counseling." Defs. Mot. Summ. J. 25. Plaintiff does not contest this point. However, "'the fact that workers are skilled is not itself indicative of independent contractor status.'" *Mathis*, 242 F.Supp.2d at 784 (quoting *Brock v. Superior Care Inc.* 840 F.2d 1054, 1060 (2d Cir. 1988)). Instead, this factor takes into account whether these skills were used in an independent manner. *Id.* For example, this factor weighs against independent contractor status where the employee relies entirely on referrals from the alleged employer in order to obtain assignments, *Brock*, 840 F.2d at 1060 (Despite the nurses' significant training and specialized skill, this factor weighed in favor of employee status where the nurses depended entirely on referrals for job assignments.), or works at the employer's office according to the employer's schedule, *Murphy*, 157 F.Supp.3d at 927 (finding this factor weighed slightly in favor of finding that the plaintiff—an anesthesiologist—was an employee where he worked at the hospital pursuant to a schedule provided by the employer); *see also Mathis*, 242 F.Supp.2d at 784 (Where the plaintiff's "work and client contacts took place at [the defendant's office] during its normal business hours . . . . this factor weigh[ed] towards a finding of an employee relationship.").

While Defendants have presented evidence that Plaintiff is skilled, Defendants have not otherwise provided evidence to show that Plaintiff utilized these skills in an independent manner. Instead, Plaintiff relied on reasonable accommodation requests and tasks from other employees and managers at BPA for her work. Plaintiff asserts she "was not asked to perform work for any other entities, nor did she solicit outside work" because she worked full time for Defendants. Am. Compl. ¶ 19. And the posting for the RAC position suggests that Defendants expected

Plaintiff to work approximately forty hours per week. *See* Hampton Decl. Exs. 2–3. Accordingly, this factor also weighs in favor of an employment relationship.

iv.     Investment in Equipment or Materials

Here, Defendants emphasize, and Plaintiff does not dispute, that Plaintiff provided her own cell phone to do her work, which was "a critical piece of equipment for [Plaintiff] to perform her function because she frequently worked out of the office." Hale-Mockley Decl. ¶ 7. Plaintiff stresses, and Defendants do not dispute, that she was provided both a computer and an email address by BPA.  Olson Decl. ¶ 7. As both devices appear integral to Plaintiff's duties as the RAC, this factor is neutral.

v.     Degree of Permanence of the Working Relationship

On this point, Defendants argue that the "lack of permanence in the working relationship is indicated in the contractual documents, which provided that [Plaintiff] was engaged to perform tasks on an 'assignment by assignment basis,'" that Defendants were "free to select [Plaintiff], or not, for any assignment," and that "'assignment end dates may be ended at the sole discretion of [Defendants] at any time.'" Defs. Mot. Summ. J. 25 (citing GSA; Hampton Decl. Ex. 1 at p. 52, Ex 3). Agreements that allow one party to terminate a relationship upon written notice support a finding of independent contractor status. *See Murphy*, 157 F.Supp.3d at 927. However, contracts that automatically renew and that either envision a long-term relationship or endure for many years suggest that the parties have an employment relationship. *Id.* at 927–28; *see also Smith v. City of Phoenix*, No. 2:14-CV-0936-HRH, 2015 WL 6811660, at *5 (D. Ariz. Nov. 6, 2014) (where the alleged employment relationship lasted for three to seven years this factor suggested a "high degree of permanence in the working relationship, even though plaintiffs signed a new contract each year").

Here, it appears that Defendants would issue yearly work orders "that specified the rate and time period of Plaintiff's work." Hampton Decl. Ex. 3. And their agreement provided that Defendants could terminate their relationship upon written notice. Both facts suggest Plaintiff was an independent contractor. *Cf. Mathis*, 242 F.Supp.2d at 785 (finding that the fact that the position was for an indefinite duration and either party could terminate it at any time suggested that there was an employment relationship). On the other hand, the parties' working relationship endured for almost five years, and the parties' initial contract envisioned a relationship of anywhere from one to five years in duration. Hale-Mockley Ex. 1 at 5. In other words, not only did the parties envision a long-term relationship, but their working relationship endured for a long period of time. Accordingly, this factor is also neutral.

vi.     Integral Part of the Employer's Business

Again, neither party addresses this factor in their briefing. However, evidence from both parties suggests that Plaintiff's services as RAC were an integral part of Defendant's business. Plaintiff states that she provided reasonable accommodation services to BPA employees and "guidance" under the Federal Rehabilitation Act and Americans with Disability Act. Olson Decl. ¶ 1; Am. Compl. ¶ 11. Defendants' own evidence indicates that the purpose of the position was to "[e]nsure that BPA meets compliance with Equal Employment Opportunity Commission (EEOC) guidelines, the Americans with Disabilities Act (ADA), and BPA policy" as well as provide assistance to employees and managers regarding reasonable accommodation requests, maintain BPA records of these requests and their dispositions, and provide information and training regarding the reasonable accommodation program. Hale-Mockley Decl. Ex. 1 at 26; Hampton Decl. Ex. 2 at 4. In her position, Plaintiff would also represent Defendants in front of

the Merit Systems Protection Board and the Equal Employment Opportunity Commission. Carter

Decl. ¶ 5. This factor, therefore, weighs in favor of characterizing Plaintiff as an employee.

B.     Joint Employment Under the FMLA

Plaintiff suggests that the joint employment regulation is applicable to this case.

Department of Labor Regulations interpreting the FMLA envision the existence of a joint

employer relationship:

(a) Where two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be joint employers under FMLA. Joint employers may be separate and distinct entities with separate owners, managers and facilities. Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:

(1) Where there is an arrangement between employers to share an employee's services or to interchange employees;

(2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,

(3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer.

(b)(1) A determination of whether or not a joint employment relationship exists is not determined by the application of any single criterion, but rather the entire relationship is to be viewed in its totality. For example, joint employment will ordinarily be found to exist when a temporary or leasing agency supplies employees to a second employer.

29 C.F.R. § 825.106(a) & (b). Where a joint employment relationship exists, whether an

employer is the primary or secondary employer is determinative of the employer's

responsibilities under the FMLA. For example, "only the primary employer is responsible for

giving required notices to its employees, providing FMLA leave, and maintenance of health

benefits." *Id* at § 825.106(c).

When analyzing employment relationships under the FMLA, The Ninth Circuit has adopted the multi-factor joint employment test applied to cases arising under the FLSA and the Migrant and Seasonal Agricultural Workers Act (AWPA). *Moreau v. Air France*, 356 F.3d 942, 946 (9th Cir. 2004). Like the economic realities test described above, "the joint employment determination require[s] consideration of the total employment situation." *Id.* at 946. Ultimately, this test seeks to determine whether the employee is "economically dependent" or under the "complete economic control" of the alleged employer. *Id.* at 947–48.

The analysis proceeds in two steps. *Id.* at 950–51. First, the court looks to four "regulatory" factors described in *Bonnette v. California Health and Welfare Agency*: 'whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Id.* at 946–47 (quoting *Bonnette,* 704 F.2d at 1470); *see also id.* at 950 ("We begin by considering the *Bonnette* factors, which roughly correspond to the *Torrez-Lopez* 'regulatory factors.'"). Second, to the extent that they are applicable the court looks to additional non-regulatory factors described in *Torres-Lopez v. May:*

(1) whether the work was a specialty job on the production line;

(2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes;

(3) whether the premises and equipment of the employer are used for the work;

(4) whether the employees had a business organization that could or did shift as a unit from one worksite to another;

(5) whether the work was piecework and not work that required initiative, judgment or foresight;

(6) whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill;

(7) whether there was permanence in the working relationship; and

(8) whether the service rendered is an integral part of the alleged employer's business.

*Id.* at 947–48 (quoting *Torrez-Lopez,* 111 F.3d at 639).

Neither party applies the test described above to the facts of this case. However, the record suggests that Defendants were a joint employer under the regulations.[4] The majority of the *Bonnette* factors suggest that Defendants were Plaintiff's employer. First, Defendants had the power to hire and fire Plaintiff. Pursuant to the MSA, Defendants were free to select Plaintiff or not for the RAC position. Hampton Decl. Ex. 1. As evidenced by correspondence between managers at Defendants and MBO, Defendants had the power to terminate Plaintiff. *Id.* at Ex. 7. Second, as described above, Defendants supervised and controlled Plaintiff's work. And as between MBO and Defendants, the MSA indicated that MBO would not select assignments or direct or supervise the work of "associates." *Id.* at Ex. 1 at 53. Third, it appears that BPA paid Plaintiff for her services on an hourly basis after she entered hours she worked in a software program. *Id.* at ¶ 5. BPA determined Plaintiff's rate of payment, *Id.* at Exs. 2–3; *see also id.* at Ex. 5 (email between Plaintiff and Defendants requesting a pay increase), though, as a payroll service, MBO was ultimately responsible for paying Plaintiff, *id.* at Ex. 1 at 52. Fourth, the record suggests that MBO Partners was responsible for maintaining employment records. *Id.* Finally, to the extent that they are applicable, the non-regulatory *Torres-Lopez* factors—which overlap with the factors of the economic realities test applied in the preceding section—counsel

---

[4] The case law is unclear on whether this test is applicable only if MBO was an employer. *Compare Chao*, 709 F.Supp.2d at 1062 (noting that "the analysis occurs in a vacuum, since no subcontractor has been identified . . . as the actual employer. However, this court may still evaluate whether Defendants are joint employers under this test.") *with Montoya v. 3PD, Inc.*, No. CV-13-8068-PCT-SMM, 2014 WL 3385116 at *1 (D.Ariz. July 10, 2014) (applying the joint employer test where the plaintiffs had contracted with one defendant who, in turn, contracted with another defendant). Further, there is little evidence in the record regarding this relationship. On one hand, Plaintiff's agreement with MBO suggests that she was a contractor. GSA at (1)(A) (indicating that Plaintiff was a "sole proprietor"). On the other hand, Plaintiff was provided a w-2 and other benefits by MBO, *id.* at (E), and BPA referred to MBO as Plaintiff's "employer of record," Hampton Decl. Ex. 7 at 4 (email from MBO account manager to BPA indicating that MBO was Plaintiff's "employer of record").

toward a finding that Defendants are an employer. Accordingly, most of the factors support a finding that there was an employment relationship between Plaintiff and Defendants

**II.    Defendants' Willful Violation of Plaintiff's FMLA Rights**

Defendants also argue that summary judgment in their favor is warranted because, assuming Plaintiff is an employee, Defendants did not terminate Plaintiff and any alleged violation of the FMLA was not willful. The Court finds, however, that there is a triable issue as to whether Defendants' willfully failed to reinstate Plaintiff to an equivalent position at the end of her protected leave.

A.  Plaintiff's FMLA Claims

The FMLA "creates two interrelated substantive rights for employees." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003). "First, an employee has the right to take up to twelve weeks of leave" for the reasons described in the statute. *Id.* Second, an employee who takes such leave "has the right to be restored to his or her original position or to a position equivalent in benefits, pay, and conditions of employment upon return from leave." *Id.* (internal citations omitted).

It is unlawful for an employer to "interfere with, restrain, or deny the exercise or the attempt to exercise, any right provided" by the FMLA. *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) (citing 29 U.S.C. § 2615(a)(1)). The Ninth Circuit has recognized two theories for recovery under 29 U.S.C. § 2615, "the retaliation or discrimination theory and the entitlement or interference theory." *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011) (quoting *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002)). "While the FMLA does not clearly delineate these two claims with the labels 'interference' and 'retaliation,' those are the labels courts have used in describing an employee's

claims under the Act." *Id.* (quoting *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206 n. 9 (11th Cir. 2001)).

In three separate counts, Plaintiff alleges that Defendants both interfered with her rights under the FMLA and retaliated against her for opposing Defendants' unlawful FMLA practices. Plaintiff's first count is for interference under § 2615(a)(1) of the Act, which provides that "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise any right provided under this subchapter." 29 U.S.C. § 2615(a)(1); *see Bachelder*, 259 F.3d at 1124 (noting that an allegation a plaintiff has been retaliated against for exercising his or her FMLA rights is properly construed as an interference claim under § 2615(a)(1)). "[E]vidence that an employer failed to reinstate an employee who was out on FMLA leave to her original (or an equivalent) position establishes a prima facie denial of the employee's FMLA rights." *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011). The Ninth Circuit has held that where the employer fails to reinstate the employee, "the employee must establish that (1) he was eligible for FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Id.* (internal citations and quotations omitted). The *McDonnell Douglas* burden shifting analysis does not apply to FMLA interference claims, so a plaintiff "can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both." *Bachalder*, 259 F.3d at 1125.

Plaintiff's second and third claims are both considered FMLA "retaliation" or "discrimination" claims. *Bachelder*, 259 F.3d at 1124. Section 2615(b) makes it "unlawful for any person to discharge or in any other manner discriminate against any individual because such

individual has" participated in FMLA enforcement proceedings. 29 U.S.C. § 2615(b). Section 2615(a)(2) more broadly makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. *Id.* at § 2615(a)(2). For both claims, the plaintiff has to show "(1) involvement in a protected activity under the FMLA; (2) an adverse employment action; and (3) a causal link between the protected activity and the employment action." *Schultz v. Wells Fargo Bank, Nat'l Ass'n*, 970 F. Supp.2d 1039, 1059 (D. Or. Sept. 5. 2013). An adverse action in the context of retaliation clams is "any action that is 'reasonably likely to deter employees from engaging in protected activity.'" *deBarros v. Wal-Mart Stores*, No. 6:11-cv-06116-AA, 2013 WL 3199670, at *6 (D.Or. June 19, 2013) (quoting *Ray v. Henderson,* 217 F.3d 1234, 1243 (9th Cir. 2000)). In this circuit, courts apply "the *McDonnell Douglas* burden shifting framework when analyzing FMLA retaliation claims." *Schultz*, 970 F.Supp.2d at 1058; *see also deBarros*, 2013 WL 3199670, at * 4 (applying the *McDonnell Douglas* burden shifting framework to claims brought under both §§ 2615(a)(2) and (b)).

Here, Defendants construe Plaintiff's complaint as alleging "she was terminated for taking FMLA-protected leave." Defs. Mot. Summ. J. 26. Defendants contend that Plaintiff "cannot prevail on her interference claim because it is undisputed that BPA did not terminate her position" and instead "continued to welcome her back to work during and after her absences."[5] Defs. Mot. Summ. J. 26–27. In other words, they appear to argue that Plaintiff cannot prove the

---

[5] Though Defendants request summary judgment on all three of Plaintiff's claims, Defendants argument here only appears to challenge Plaintiff's interference claim. Defs. Mot. Summ. J. 26 (arguing that Plaintiff "cannot prevail on her interference claim"), 28 (Plaintiff's "interference claim is unavailing."). And while Defendants acknowledge early in their briefing that Plaintiff brings three distinct FMLA claims, Defendants do not address Plaintiff's claims for retaliation under § 2615(a)(2) or § 2615(b), which assert that Defendants discriminated against her and failed to reinstate her as a result of her (1) "complaints filed with the BPA EEO and/or BOLI and the EEOC" and (2) "opposing one of Defendant's practices prohibited by [the] FMLA." Am. Compl. ¶¶ 101, 106.

fifth element of her prima facie case for interference: that Defendants denied her FMLA benefits to which she was entitled.

As a preliminary matter, the Court notes that Defendants' interpretation narrows the allegations in Plaintiff's complaint. First, Plaintiff alleges in her interference claim that Defendants failed to notify her of her rights as required under the FMLA. Am. Compl. ¶ 96 ("Defendants failed to provide Plaintiff notice of her leave rights and entitlement, as required by 29 CFR § 825.300(d)–(e). . . ."). Such a failure may be properly construed as interference with Plaintiff's FMLA rights under § 2615(a)(1). *See Liston v. Nevada ex. rel its Dep't of Bus. & Industry*, 311 Fed.Appx. 1000, 1002 (9th Cir. 2009) ("The failure to notify an employee of her rights under the FMLA can constitute interference if it affects the employee's rights under the FLMA."). Given Defendants failure to address this allegation in their motion, Defendants are not entitled to summary judgment on Plaintiff's interference claim.

Second, Plaintiff alleges that "Defendants denied Plaintiff reinstatement by failing to restore her to employment at the conclusion of her leave." Am. Compl. ¶ 96. To counter this allegation, Defendants contend that they did not terminate Plaintiff's employment. Defs. Mot. Summ. J. 26–32. Specifically, they provide evidence that demonstrates an email purporting to terminate Plaintiff was sent in error, that Plaintiff's network access was terminated pursuant to a company-wide security policy and was to be restored upon her return, and that they repeatedly welcomed her back to work. *Id.*; Defs. Reply 3–5, ECF 111.

While Defendants may be correct that Plaintiff ultimately was not terminated, this alone is insufficient to defeat Plaintiff's allegations for FMLA interference because a reasonable juror could find that Defendants failed to reinstate Plaintiff to an equivalent position at the end of her leave in violation of the FMLA. "[T]he FMLA requires that an employer reinstate an employee

after taking [protected] leave, so long as the employee would still be employed in the position had she not taken FMLA leave." *Sanders*, 657 F.3d at 780–81. The regulations provide:

> On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. An employee is entitled to such reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence.

29 C.F.R. § 825.214. "An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits, and working conditions, including privileges, prerequisites, and status" and "involve[s] the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." *Id.* at § 825.215(a). In order to "deny restoration to employment," "an employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested." *Id.* at § 825.216(a). Where an employee is hired for a specific term or project, the employer's obligation to restore the employee only extends through the term or project for which they were hired if the employer "would not otherwise have continued to employ the employee." *Id.* at (a)(3).

Defendants argue that the position Plaintiff was to return to was equivalent to the position that Plaintiff had prior to her protected leave.[6] Defs. Mot. Summ. J. 28. However, viewing this evidence in the light most favorable to Plaintiff, the Court cannot find that as a matter of law Defendants intended to restore Plaintiff to an equivalent position upon her return. The parties do not dispute that while Plaintiff was on leave, Plaintiff's position as RAC was filled by a full-time

---

[6] Defendants, in passing, also suggest that Plaintiff was incapable of fulfilling the position of reasonable accommodations coordinator. Defs. Mot. Summ. J. 28. However, Defendants have the burden on this issue, and they have not provided any evidence that suggests that this was the case. *See Sanders*, 657 F.3d at 780 ("[I]t is clear from other regulations that the burden rests with the employer to establish whether the employee can perform the essential functions of the job.")

employee of Defendants. While Defendants assert that Plaintiff would continue to do work in her substantive area of expertise through the end of her contract period, *id.* at 28, other evidence in the record suggests that Plaintiff's duties would primarily focus on training her replacement rather than performing her prior duties as RAC. For example, Ms. Hale-Mockley stated that she intended to "continue to provide [Plaintiff] with substantive work within her area of expertise in the [reasonable accommodation] field upon her return to work." Hale-Mockley Decl. ¶ 21. However, she also asserts that she and Mr. Carter agreed that when Plaintiff "returned from her absence she would continue to work by helping transition Ms. Riffel into the RAC role." Hale-Mockley Decl. ¶ 20; *see also* Carter Decl. ¶ 7 (noting that "when [Plaintiff] returned from her absence she would continue to work through the end of her contract by helping transition Ms. Riffel into the RAC role"). In an email exchange from May 30, 2014, Plaintiff indicated that her understanding was that Defendants had "already hired a Reasonable Accommodation coordinator" who they wanted Plaintiff to train. Hampton Decl. Ex. 13 at 3. And, on June 11, 2014, Mr. Hampton told Plaintiff via email that upon returning to her regular work schedule she would "assist with creating Reasonable Accommodation resources for the BPA employee who is assuming the Reasonable Accommodation Coordinator workload." *Id*. at Ex. 15.

Without citation to any specific evidence, Defendants also contend that because Defendants had the sole right to determine the nature of Plaintiff's assignments, she "did not have any entitlement to determine what assignments she performed on her return." Defs. Mot. Summ. J. 28. The evidence submitted, however, does not support Defendants' contention. While Plaintiff worked on an "assignment by assignment basis" as specified in work orders attached to the MSA, Hampton Decl. Ex. 1 at 52, the work order attached to Mr. Hampton's declaration suggests that Plaintiff's assignment during the period in question and through January 1, 2015,

involved the duties ascribed to the RAC position. *See id.* at Ex. 2–3. Indeed, Mr. Hampton states

that the "scope of [Plaintiff's] work under the MSA was determined by a job posting which

became an assignment under the MSA," *id.* at ¶ 3, and the job posting in question specifically

refers to the duties of the RAC position, *id.* at Ex. 2 at 4. Accordingly, a reasonable jury could

infer that Plaintiff was entitled to the RAC assignment or a job with equivalent duties.

Defendants also contend that Plaintiff did not "avail herself of the opportunity to return to

work." Defs. Mot. Summ. J. 26–27. However, there is a dispute of fact of whether Plaintiff

attempted to return to work prior to the end of her twelve weeks of protected leave. Defendants

emphasize that Plaintiff was encouraged to return to work by her managers, that she indicated

she was unsure she would be able to work as much as she had previously, and that she failed to

return to work for the five-hour work trial the parties agreed upon at their June 5, 2014 meeting.

Hampton Decl. ¶ 18, Ex. 15. Plaintiff, by contrast, contends that Defendants effectively denied

her attempts to return to work. Olson Decl. ¶ 16, Ex. 6. She asserts that they did so by telling her

not to work remotely and cutting of her access to Defendants' network. *Id.* Moreover, the

evidence suggests that when Plaintiff was discussing her desire to return and attempt to work

with Defendants she received confirmation of their decision to fill the RAC position with a

federal employee who she would be tasked with training upon her return. Am. Compl. ¶ 59;

Hampton Decl. Exs. 13, 15. Accordingly, Defendants are not entitled to summary judgment

merely because Plaintiff did not return to complete a trial work period in a position that was

different from the RAC position she had previously. *See Hunt v. Rapides Healthcare Sys., LLC*,

277 F.3d 757, 767 (5th Cir. 2001) ("In sum, the record discloses genuine issues of disputed fact

material to determining whether [the plaintiff] attempted to return to work before her twelve-

week FMLA leave expired and, if so, whether the Medical Center offered her a position

equivalent to her prior job."), *abrogated on other grounds by Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702 (5th Cir. 2016).

In sum, while Defendants allege that Plaintiff was welcomed back to work and that any changes constitute a "mere change in title," Defs. Mot. Summ. J. 29, a reasonable jury could find that transitioning Plaintiff from serving as the RAC to training her replacement months prior to the end of her contract term constitutes a change in job duties in violation of the FMLA. *See Wellington v. Lane Cty.,* 460 Fed.Appx. 690, 692 (9th Cir. 2011) (determining there was a genuine issue of material fact as to whether the plaintiff returned to an equivalent position where the plaintiff "retained the same pay, benefits, and job title" but the defendant "reassigned him to a different work location, eliminated his supervisory authority, and modified his managerial responsibilities"). Accordingly, the Court concludes that there is a triable issue as to whether Defendants provided Plaintiff with an "equivalent position" at the end of her protected leave. Summary judgment is therefore inappropriate on Plaintiff's interference claim.

B. Whether Defendants willfully interfered with Plaintiff's FMLA rights

Defendants allege that Plaintiff is precluded from bringing a strict liability claim under the FMLA because Plaintiff's Amended Complaint, in which Plaintiff first brought claims against Defendants, was filed more than two years after the last event on which Plaintiff's FMLA claims could be based. Defs. Mot. Summ. J. 25–26. Defendants contend that Plaintiff must show that any alleged violation of the FMLA was willful in order to prevail on her claims. *Id.* at 26. Generally, the statute of limitations for claims arising under the FMLA is two years "after the date of the last event constituting the alleged violation." 29 U.S.C. § 2617(c)(1). The statute of limitations extends to three years, however, for violations that are "willful." *Id.* § 2617(c)(2). Plaintiff does not appear to contest the application of the willfulness standard to her claims. *See*

Pl. Resp. Mot. Summ. J. 5 (arguing that there is a genuine issue of fact as to whether the adverse action as "willful"). Given that Plaintiff's Amended Complaint was filed on March 13, 2017, more than two years after the acts underlying Plaintiff's claims, the Court agrees with Defendants that Plaintiff's claims are time barred unless Defendants' violations were willful.

"[N]either the Supreme Court nor the Ninth Circuit Court of Appeals has defined willfulness under the FMLA," but "other circuits have looked to the Supreme Court's definition of 'willful' in the context of the Fair Labor Standards Act." *Shulman v. Amazon.com, Inc.*, No C13-247RSM, 2013 WL 2403256, at *2 (W.D. Wash., May 30, 2013). "Under the FLSA, an employer acts 'willfully' when he or she 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *Schultz*, 970 F.Supp.2d at 1053 (citing *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988)); *see also Hollowell v. Kaiser Found. Health Plan of the NW*, 705 Fed.Appx. 501, 503 (9th Cir. 2017) (applying *McLaughlin*'s willfulness standard to an FMLA claim).

In *Schultz*, the district court found that "the evidence precludes a finding as a matter of law that [the defendant's] violation was not willful." *Schultz*, 970 F.Supp.2d at 1054. There, the evidence showed that everyone involved in the alleged adverse employment actions "knew she had taken protected leave," the "demotion and transfer occurred within days of her return from her third protected leave," and "her termination occurred just over seven months from her return from that protected leave." *Id.* at 1053–54. The plaintiff was subject to invasive questions regarding her medical conditions and need for future leave as well as critical performance reviews around the time she took protected leave. *Id.* at 1054.

Here, there is a dispute of material fact as to whether Defendants alleged interference with Plaintiff's FMLA rights was willful. Defendants contend that their actions could not be

willful because: (1) the relevant managers did not believe the FMLA applied to Plaintiff as an independent contractor, (2) they consulted with counsel to comply with their legal obligations, (3) they had already decided to transfer the reasonable accommodation position to a federal employee at the end of Plaintiff's contract, and (4) they encouraged Plaintiff to return to work. Defs. Mot. Summ. J. 30. Defendants also state that they did not learn of Plaintiff's request for FMLA leave until after they had decided to transfer the RAC position to a federal employee in early April. Hampton Decl. ¶ 16 (stating that he learned of Plaintiff's request at some point in May, and that he "was not aware of any medical conditions that [Plaintiff] had that affected her ability to provide services to BPA"); Hale-Mockley Decl. ¶ 24 (stating she learned "sometime during her absences" that "[Plaintiff] had submitted an FMLA application to MBO"); Carter Decl. ¶ 8 (stating that when he "approved Ms. Hale-Mockley's request to transfer the RAC duty to a federal employee, [he] was not aware that [Plaintiff] had submitted an FMLA application to MBO Partners").

However, there is also evidence in the record that suggests that Plaintiff had notified Defendants that she was taking leave for medical reasons prior to the transfer of the RAC position. Generally, "[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA." *Bachelder*, 259 F.3d at 1130 (citing 29 C.F.R. § 825.302(c)). "Employees need only notify their employers that they will be absent under circumstances which indicate that the FMLA might apply." *Id.* "The employer should inquire further . . . if it is necessary to have more information about whether FMLA leave is being sought by the employee." *Id.*

Plaintiff indicated in a March 24, 2014 email to Ms. Hale-Mockley that her she was taking leave for medical reasons. Hale-Mockley Decl. Ex. 6. Concerned about the length of her absence, Ms. Hale-Mockley emailed Mr. Hampton that same day and informed him that Plaintiff

was on leave with no definite return date and that it was related to a medical issue. Hampton Decl. Ex. 6 at 2. In other words, the managers involved in the decision making had knowledge that Plaintiff was on leave for medical reasons.

Moreover, evidence suggests that Plaintiff's medical leave resulted in Defendants' decision to transfer the RAC position to a federal employee in April instead of at the end of Plaintiff's contract. In the same email chain where Ms. Hale-Mockley informed Mr. Hampton of the medical reason for Plaintiff's leave, they determined that they should consider "releasing her from BPA" to "find a new person to do the job." Hampton Decl. Ex. 6 at 1. When Plaintiff had been on leave for five weeks in early April, Ms. Hale-Mockley contacted Mr. Carter and they decided to transfer the position to a federal employee. Hale-Mockley Decl. ¶¶ 18–20; Carter Decl. ¶ 7. The position was formally assigned to another employee on April 14, 2014. Hale-Mockley Decl. ¶ 21.

Under these circumstances, there is an issue of material fact as to whether Defendants knew or acted in reckless disregard of the fact that Plaintiff's leave may have been protected by the FMLA when they made the alleged adverse employment decision. Summary judgment is therefore denied.

## CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment [94] is DENIED.

IT IS SO ORDERED.

Dated this _____30_____ day of _April_, 2018.


_Marco Hernández_
MARCO A. HERNÁNDEZ
United States District Judge