IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ANDREA OLSON, | No. 3:15-cv-02216-HZ |
| Plaintiff, | FINDINGS OF FACT & CONCLUSIONS OF LAW |
| v. | |
| UNITED STATES OF AMERICA, by and through the Department of Energy and Bonneville Power Administration; and JAMES RICHARD PERRY, Secretary of the Department of Energy, | |
| Defendants. | |

Dallas S. DeLuca
Katherine M. Acosta
Kristin M. Malone
MARKOWITZ HERBOLD PC
1211 SW 5th Ave., Suite 3000
Portland, OR 91204

    Attorneys for Plaintiff

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon
Jared Hager
ASSISTANT UNITED STATES ATTORNEY
1000 SW Third Ave., Suite 600
Portland, Oregon 97204

Donna A. Oden-Orr
BONNEVILLE POWER ADMINISTRATION
P.O. Box 3621
Portland, OR 97208

    Attorneys for Defendants

HERNÁNDEZ, District Judge:

This case arises out of Plaintiff Andrea Olson's employment with Defendant Bonneville Power Administration ("BPA"). Plaintiff's sole claims against Defendants the Department of Energy, BPA, and James Richard Perry arise under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601. In three separate counts, Plaintiff alleges that Defendants interfered with her rights under the FMLA and retaliated against her for opposing Defendants' unlawful FMLA practices. The Court conducted a two-day bench trial on Plaintiff's FMLA claims on September 18 and 19, 2018. The following are the Court's Findings of Fact and Conclusions of Law from that trial. *See* Fed. R. Civ. P. 52(a). As explained below, the Court finds in favor of Defendants on all of Plaintiff's claims.

## FINDINGS OF FACT

Plaintiff Andrea Olson served as the Reasonable Accommodation Coordinator ("RAC") for Defendant Bonneville Power Administration ("BPA") from 2010 to 2014.[1] Plaintiff has a bachelor's degree in business administration from the University of Oregon and a master's

---

[1] In the Court's Opinion & Order on Defendant's Motion for Summary Judgment the Court found that Plaintiff was an employee and, therefore, covered by the protections of the FMLA.

degree in rehabilitation counseling from Western Oregon University. Prior to working for BPA, Plaintiff was an outreach coordinator for the Oregon Telecommunications Relay Service and the Oregon Telecommunication Devices Access Program.

As the RAC, Plaintiff worked with Sharon Hale-Mockley, who was hired as the Talent Sustainment Manager for BPA in 2009. As the Talent Sustainment Manager, Ms. Hale-Mockley ensured compliance with regulations and tried to meet employee needs in areas such as occupational health, benefits, and wellness. Plaintiff also worked alongside Susan Riffel, a federal employee who oversaw various programs, including the telework and FMLA coordinator programs.

Brian Carter—Ms. Hale-Mockley's supervisor—started working for BPA in 2013 as the director of human resources. At the beginning of his employment with BPA, he started a major overhaul of BPA's human resources. As part of the "Get Well Plan" to remedy problems with management culture and the hiring process, Mr. Carter sought to replace many of the contractors working within human resources with federal employees when their contracts expired. Scott Hampton, the manager of BPA's Supplemental Labor Management Office ("SLMO"), also worked with Ms. Hale-Mockley and Plaintiff. He oversaw the operations of SLMO, including the onboarding and offboarding of contract workers. In this position, he did not have authority to either hire or fire contractors unilaterally.

The parties' relationship began in January of 2010, when Plaintiff was awarded a contract with BPA to serve as its RAC. Defendants were impressed by Plaintiff's expertise and training. As described in the job posting, the RAC was responsible for the interactive process, training managers and employees, educating the workforce on rights and responsibilities under the ADA and EEOC, and maintaining records and documentation related to the reasonable

accommodation process. Ex. 505. The list of responsibilities in the job description was nonexclusive. Ex. 505 at 4. Both the master services agreement and contractor's handbook included continuity of services provisions, exs. 503, 583, which Mr. Hampton testified ideally included training a successor contractor or federal employee. Ms. Hale-Mockley also testified that part of Plaintiff's job duties were special requests and projects that Ms. Hale-Mockley would assign from time to time.

As the RAC at BPA, Plaintiff testified that she was responsible for the interactive process, or the process by which BPA assists employees seeking reasonable accommodations. The interactive process would begin with an employee reaching out to Plaintiff or their supervisor for help. After discussing their limitations—or obtaining the required medical documentation from the employee—Plaintiff would work with the employee to find an appropriate accommodation. Sometimes this required her to be onsite, as Plaintiff would need to evaluate the workspace and assess workplace adjustments. Ms. Hale-Mockley was only involved if Plaintiff was going to deny a reasonable accommodation request or if BPA finances were involved. Because Plaintiff was not a federal employee, she could not approve accommodations that required the expenditure of BPA resources. This process consumed a considerable amount of her work time.

Plaintiff's position also entailed other tasks, including modifications to equipment; document retention, recordkeeping, and maintaining confidentiality; providing training or "teaching moments" to management; assisting with EEO compliance; and completing special assignments from Ms. Hale-Mockley, who occasionally directed her priorities to more pressing projects. Generally, however, Ms. Hale-Mockley was not responsible for assigning her work. Plaintiff testified that these other tasks—such as recordkeeping and priority projects—were

marginal parts of her job. She also testified that many of these tasks could not be accomplished via telework. For example, Plaintiff was unable to keep all documents and records confidential, repossess equipment, provide training, or meet face-to-face with BPA employees when she worked remotely.

Plaintiff's hours depended largely on client needs. By the end of her employment in 2014, Plaintiff was working on average 27.6 hours per week. Ex. 12. But Plaintiff testified that she billed conservatively while employed with BPA and would often work more than she billed. She did so with the hope of impressing the agency and securing a long-term position with BPA.

Plaintiff was successful at BPA. Plaintiff testified that she was recognized for her work with the agency. She was the primary contact for the agency on the Department of Energy website and was recognized for her use of the Computer/Electronic Accommodations program in telework. Ms. Hale-Mockley similarly testified that, until the Spring of 2014, Plaintiff did good work at BPA. Plaintiff had a good rapport with her clients and the desire to serve the BPA population through the reasonable accommodations process.

In 2011, Plaintiff was told by Defendants that she would need to start contracting through MBO Partners—a third-party payroll servicing company—in order to keep her position at BPA. Under this new arrangement, BPA paid her above her contracted rate, and MBO deducted its service fees from that higher rate. In 2014, her rate of pay was $95 per hour after MBO deducted its fees.

Though the work that she did for BPA remained the same throughout this time, Plaintiff was frustrated with this new relationship, in part because she wanted to be recruited and hired by BPA. Mr. Hampton testified that Plaintiff was difficult to work with when they renegotiated her contract through MBO. They had a tense and emotional conversation that led Mr. Hampton to

suggest letting her go in 2012. Issues with Plaintiff's contract would continue to cause her stress in 2014 when she was out of the office on medical leave.

In the spring and summer of 2013, Plaintiff began experiencing anxiety. When exacerbated, Plaintiff had difficulties with processing information, focusing, and emotional dysregulation or crying episodes. Ex. 14. Despite treatment in the fall of 2013, her symptoms did not resolve. She testified that issues at work with the medical program manager during that time made her symptoms worse. Ms. Hale-Mockley oversaw both Plaintiff and the medical program manager, and Plaintiff was concerned that her December 2013 complaint against him could result in retaliation against her by Ms. Hale-Mockley. In addition, in the spring of 2014, Plaintiff said that it became increasingly difficult to obtain responses or approvals from Ms. Hale-Mockley, preventing her from wrapping up her cases and working with new clients.

Around March 13, 2014, Plaintiff made a formal reasonable accommodation request through MBO. To help her anxiety, she asked to: (1) telework to reduce time on site except for meetings and tasks to be performed onsite; (2) receive responses from Ms. Hale-Mockley via email within a time frame deemed reasonable by the BPA reasonable accommodation program manager; and (3) have open communication with the Department of Energy RAC for guidance and best practices. Ex. 1. Plaintiff testified that if she had continued working subject to these accommodations she would have been able to perform all of her job responsibilities. On March 13, Mr. Hampton was alerted to Plaintiff's reasonable accommodation requests by MBO.

On March 14, 2014, Plaintiff's anxiety was exacerbated by difficulties obtaining approval for an accommodation from Ms. Hale-Mockley. After she found herself walking in the halls crying, she decided it was time to recharge her batteries. She took the week of March 17 off from work. Ex. 511.

The following week on March 24, Plaintiff sent Ms. Hale-Mockley another email informing her that she would be out of the office again. Ex. 2. She noted that she was out of the office for medical reasons. Ex. 2. Around this time, Plaintiff also sent an email to MBO formally invoking FMLA. Ex. 14. In her FMLA documentation, Plaintiff's medical provider indicated that, when Plaintiff's symptoms worsened, she would be temporarily unable to perform most job functions. Ex. 521. She also indicated that Plaintiff might not be able to work for up to five days per week and needed to limit the hours she was onsite when she was able to work. Ex. 521.

Plaintiff asked MBO to notify her before releasing her FMLA request or related documentation to BPA and believed that MBO was communicating about her leave and condition with BPA. Plaintiff, however, never received any communication from BPA about her FMLA rights or the nature of her leave. Based on her experience as the RAC, Plaintiff believed that she had invoked intermittent FMLA leave. Plaintiff testified that if she had received notice of her rights from BPA, it would have helped her "connect the dots" so she could advocate for her accommodations and mitigate her anxiety.

By the time Plaintiff took leave, she was drowning in work. Ex. 515. The week before she took leave, she worked over 40 hours. Ex. 12. Ms. Hale-Mockley testified that this was a particularly busy period because BPA was undergoing structural and staffing changes and hiring new veterans, who would come in with potential accommodation requests. During her time out of the office, Ms. Hale-Mockley took on some of Plaintiff's RAC responsibilities. Plaintiff referred all requests to Ms. Hale-Mockley. Plaintiff also asked Ms. Riffel to follow-up on the reasonable accommodation inbox, which Ms. Riffel had helped Plaintiff set up years earlier. Ex. 514

After receiving Plaintiff's March 24 email, Ms. Hale-Mockley contacted Mr. Hampton to inform him that Plaintiff was out of the office for a medical reason with no known date of return. Ex. 520. Plaintiff had never been out of the office so long without a return date, and Ms. Hale-Mockley was concerned about having a potential gap in reasonable accommodation services for BPA employees. Mr. Hampton suggested releasing her from her contract. Though Ms. Hale-Mockley considered Plaintiff to be a valuable asset to BPA, she had begun to hear some customer service concerns while Plaintiff was out of the office and was worried that Plaintiff was unhappy in her contract. Exs. 520, 528. Because of her concerns, Ms. Hale-Mockley indicated that she agreed with Mr. Hampton's suggestion that they consider releasing Plaintiff. Ex. 520. After discussing it, they decided to first try and meet with Plaintiff. Plaintiff, however, did not attend their April 1 meeting.

On April 3, 2014, Ms. Hale-Mockley found out that Plaintiff was going to be out of the office for two additional weeks with no defined return-to-work date. Ex. 523. After asking Plaintiff not to work while she was out of the office, Ms. Hale-Mockley approached Mr. Carter about coming up with a strategy to meet client and customer needs and reducing the reasonable accommodation workload. Though Mr. Carter had intended to let Plaintiff's contract expire naturally before transitioning the RAC position to a federal employee, he ultimately agreed with Ms. Hale-Mockley that the RAC position could be assigned as a collateral duty to another staff member. Ms. Hale-Mockley conveyed the plan to cancel Plaintiff's contract to Mr. Hampton on April 6, 2014, but they ultimately did not release her after conferring with BPA's legal department. Ex. 524.

The collateral duty was assigned to Ms. Riffel on April 14, 2014. Ex. 529. According to Ms. Hale-Mockley, collateral duties are often not celebrated by employees as they are additional

duties to the primary responsibilities the employee is already assigned. The employee's title, grade, and pay remain the same. As a federal employee, Ms. Riffel was able to take on all the duties that Plaintiff performed as RAC as well as those tasks—such as purchasing—that Ms. Hale-Mockley was required to perform as a federal employee.

Because Plaintiff never returned to work, it is unclear exactly what Plaintiff's co-coordinator position would have entailed upon her return. Mr. Carter, Ms. Hale-Mockley, and Mr. Hampton all anticipated that Plaintiff would have spent some of her time training Ms. Riffel. But nothing in the job request through SLMO would have changed. Ms. Hale-Mockley anticipated that Plaintiff's duties would have largely stayed the same. Because there was a significant backlog, Plaintiff's focus would have been to get through the administrative duties first, then train Ms. Riffel, and ultimately work as a partner in the reasonable accommodation process if she was capable of working. Plaintiff would follow-up on her previous cases, continue to engage in the interactive process, train management, and perform other administrative functions. Because Ms. Riffel was new to her collateral duty, Ms. Hale-Mockley also believed that she needed Plaintiff's expert voice and advice. Plaintiff would have continued to earn $95 per hour, and her schedule would fluctuate based on client needs.

Plaintiff continued to extend her leave and was not medically cleared to return to work by the end of April. Exs. 522, 523, 531. However, she did attempt some limited teleworking so that she could stay in the loop for her transition to work. Exs. 12, 532. Though Plaintiff did not feel that she was unable to perform any work, Ms. Hale-Mockley told her that she did not want or expect her to work while she was out of the office.[2] Ex 532.

---

[2] As described by Ms. Hale-Mockley at trial, "OOO" or "out of office" is used by BPA employees to indicate that the employee is unavailable as opposed to teleworking. Thus, employees who were out of the office were not expected to perform any work while they were away, and Ms. Hale-Mockley was surprised when Plaintiff worked

On April 29, 2014, Plaintiff contacted BPA's Equal Employment Opportunity ("EEO") office to ask about filing a complaint. When she met with an EEO representative, they informed her that she needed to complete the "Five Questions" document, which she turned in on May 27, 2014. Plaintiff testified that she alleged in that document that BPA had violated her FMLA rights.

On April 30, Plaintiff received an email indicating that she had been terminated. Ex. 8. Shortly thereafter, the message was recalled because it was sent in error. Ex. 535, 537. Plaintiff had not been terminated, but her access to the BPA network and property was being revoked. As an electric utility, BPA it subject to the guidelines from "NERC-CIP" or the North American Electric Reliability Council Critical Infrastructure Protection, which requires BPA to be diligent about ensuring that only individuals who are actually working at BPA have access to its facilities. Accordingly, BPA security procedures require revocation of access for anyone out of the office longer than one month. Ex. 537. Thus, Plaintiff could no longer access the resources she needed to telework after April 30. Despite the revocation of her network access, Plaintiff worked for BPA after April 30 and billed for three hours in the first half of May. Exs. 12, 538.

In early May, Plaintiff contacted Ms. Hale-Mockley to let her know that she was going to attempt a trial work period. Ex. 538. Plaintiff, however, did not attempt her trial work period at this time. On May 30, 2014, Mr. Hampton reminded Plaintiff via email that she was under a stop-work order and could not do any more billable work for BPA until notified that she could begin working again. Ex. 540. He told Plaintiff that to remove the stop-work order, she would have to meet with him face-to-face. Mr. Hampton testified that he wanted to discuss Plaintiff's accommodations and ensure that Plaintiff could work. In this email, he also confirmed Plaintiff's

---

during this time. Ms. Hale-Mockley further testified that she was concerned about Plaintiff working while out of the office because the reasonable accommodation program required coordination that was difficult to do remotely.

understanding that BPA was planning to transition the RAC position to a federal employee and that some transition time between her and the new employee was desired. Ex. 540. Plaintiff interpreted this as indicating she no longer had her job.

On June 5, 2014, Mr. Hampton and Plaintiff met at BPA's campus with the EEO representative. They discussed, among other things, Plaintiff's three accommodations requests from March and Plaintiff's EEO complaint. Ex. 542. In a follow-up email on June 11, Mr. Hampton indicated that BPA agreed to her first and second accommodations and offered Plaintiff a trial work period of five hours.[3] Ex. 543. Mr. Hampton noted that Ms. Hale-Mockley had a specific project in mind for the five-hour period. Ex. 543. From this email, Plaintiff concluded that she was being invited back to train her replacement.

Plaintiff was instructed to contact Ms. Hale-Mockley to schedule the trial work period and obtain details about the project she had in mind. Ms. Hale Mockley testified that the special project entailed developing materials to bring Ms. Riffel up to speed on the program. Mr. Hampton also told Plaintiff that after the trial period Defendants wanted Ms. Olson to return to her regular work schedule.   Plaintiff emailed Ms. Hale-Mockley on June 12, 2014, and informed her that her attorney would be in touch. Ms. Hale-Mockley responded that she would await further information, but Plaintiff never followed up. She felt that the RAC position was no longer her job and that she had been replaced.

Plaintiff testified that if BPA had offered her the RAC position and agreed to her accommodations she could have and would have returned to work. However, she also indicated that her stressors—including the contracts dispute, the EEOC action, and her issues with Ms.

---

[3] As Mr. Hampton tesitified at trial, Defendants did not grant Plaintiff's third request—to communicate directly with the Department of Energy regarding its reasonable accommodation program—because BPA preferred not to have contractors represent BPA to third parties. *See also* ex. 543.

11- FINDINGS OF FACT & CONCLUSIONS OF LAW

Hale-Mockley—had not resolved in 2014. These stressors all exacerbated her anxiety symptoms as detailed in her original FMLA paperwork filed with MBO.

## CONCLUSIONS OF LAW

The FMLA "creates two interrelated substantive rights for employees." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003). "First, an employee has the right to take up to twelve weeks of leave" for the reasons described in the statute. *Id.* Second, an employee who takes such leave "has the right to be restored to his or her original position or to a position equivalent in benefits, pay, and conditions of employment upon return from leave." *Id.* (internal citations omitted).

It is unlawful for an employer to "interfere with, restrain, or deny the exercise or the attempt to exercise, any right provided" by the FMLA. *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) (citing 29 U.S.C. § 2615(a)(1)). The Ninth Circuit has recognized two theories for recovery under 29 U.S.C. § 2615, "the retaliation or discrimination theory and the entitlement or interference theory." *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011) (quoting *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002)). "While the FMLA does not clearly delineate these two claims with the labels 'interference' and 'retaliation,' those are the labels courts have used in describing an employee's claims under the Act." *Id.* (quoting *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206 n. 9 (11th Cir. 2001)).

The Court finds that Plaintiff has not shown by a preponderance of the evidence that Defendants interfered with Plaintiff's FMLA rights or retaliated against Plaintiff in violation of the FMLA. First, Plaintiff has not demonstrated that Defendants' failure to notify her of her FMLA rights interfered with her rights under the FMLA. Second, Plaintiff has not demonstrated

that Defendants either terminated her or failed to reinstate her to an equivalent position at the end of her protected leave. In addition, Defendants have shown that it was more likely than not that Plaintiff could not have returned to her position in June when her leave expired. Third, Plaintiff has not demonstrated that Defendants discriminated or retaliated against her as there is no causal connection between Plaintiff's complaints and the alleged adverse actions in this case. Fourth, Plaintiff has not shown that any alleged violation was willful as required under FMLA's three-year statute of limitations. Accordingly, the Court finds for Defendants on Plaintiff's FMLA claims.

I.   **FMLA Interference**

Plaintiff's first count under the FMLA is for interference under § 2615(a)(1) of the Act, which provides that "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise any right provided under this subchapter." 29 U.S.C. § 2615(a)(1); *see Bachelder*, 259 F.3d at 1124 (noting that an allegation a plaintiff has been retaliated against for exercising his or her FMLA rights is properly construed as an interference claim under § 2615(a)(1)). "[E]vidence that an employer failed to reinstate an employee who was out on FMLA leave to her original (or an equivalent) position establishes a prima facie denial of the employee's FMLA rights." *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011). The Ninth Circuit has held that where the employer fails to reinstate the employee, "the employee must establish that (1) he was eligible for FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Id.* (internal citations and quotations omitted). Plaintiff alleges that Defendants

interfered with her FMLA rights in two ways: (1) by failing to notify her of her rights and (2) by failing to restore her to her position at the end of her leave.

A. Failure to Notify

Employers are required to notify employees of their FMLA rights. 29 C.F.R. § 825.300. "Failure to follow the notice requirements . . . may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." *Id.* at § 825.300(e). "The failure to notify an employee of her rights under the FMLA can constitute interference if it affects the employee's rights under the FMLA." *See Liston v. Nevada ex. rel its Dep't of Bus. & Industry*, 311 Fed.Appx. 1000, 1002 (9th Cir. 2009). "[T]he FMLA 'provides no relief unless the employee has been prejudiced by the violation.'" *Id.* (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)).

It is undisputed that Defendants did not notify Plaintiff of her FMLA rights. However, Plaintiff has failed to show by a preponderance of the evidence that this failure impacted her rights under the FMLA. Plaintiff testified that she would have been better able to advocate for her reasonable accommodation requests, mitigate her anxiety, and return to work if she had been notified of her rights by BPA. But the evidence at trial shows that despite Defendants' failure to notify Plaintiff of her rights, Plaintiff invoked the FMLA by filing the relevant paperwork with MBO, took leave, and had the opportunity to return to work for a trial work period with the accommodations she requested. As discussed in more detail below, Defendants have also demonstrated that Plaintiff was more likely than not unable to return to work at the end of the relevant period and perform essential functions of her job. Consequently, any failure to notify Plaintiff of when her leave began and would end did not prejudice Plaintiff. *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 161–62 (2d Cir. 1999) ("[The plaintiff's]

right to reinstatement could not have been impeded or affected by the lack of notice because his leave was caused by a serious health condition that made him unable to perform the functions of his position, and it is undisputed that that inability continued for some two months after the end of his 12-week FMLA leave period.") Accordingly, Defendants' failure to notify does not constitute interference with Plaintiff's FMLA rights.

B.    Failure to Restore

"[T]he FMLA requires that an employer reinstate an employee after taking [protected] leave, so long as the employee would still be employed in the position had she not taken FMLA leave." *Sanders*, 657 F.3d at 780–81. The regulations provide:

> On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. An employee is entitled to such reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence.

29 C.F.R. § 825.214. "An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits, and working conditions, including privileges, prerequisites, and status" and "involve[s] the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." *Id.* at § 825.215(a).

In order to "deny restoration to employment," "an employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested." *Id.* at § 825.216(a). In addition, "[i]f the employee is unable to perform an essential function of the position because of a physical or mental condition . . . the employee has no right to restoration to another position under the FMLA." *Id.* at (c). "Determining what functions are 'essential' to a particular position is a question of fact." *Sanders*, 657 F.3d at 782. "[I]f an employer denies an

employee reinstatement on the ground that the employee cannot perform the essential functions of the employee's position, the burden of proof rests with the employer, not the employee." *Id.* at 781. Where an employee is hired for a specific term or project, the employer's obligation to restore the employee only extends through the term or project for which they were hired if the employer "would not otherwise have continued to employ the employee." 29 C.F.R. § 825.216(a)(3).

Plaintiff has failed to prove by a preponderance of the evidence that Defendants interfered with her FMLA rights by either terminating her or failing to reinstate her to an equivalent position. First, the evidence shows that Defendants did not terminate Plaintiff. Contemporaneous emails and Mr. Hampton's testimony show that the email terminating Plaintiff was sent in error and that her network access was revoked for security reasons consistent with agency security procedures and regulations. Plaintiff also continued to do some work remotely after she was allegedly terminated, and Defendants offered to meet with her to discuss her return and reinstate her access to the BPA network.

Second, had Plaintiff returned to work, Defendants would have reinstated her to the same or an equivalent job. The precise nature of the position was not well defined, in part because Plaintiff ultimately did not take the opportunity to return to work. But Plaintiff would have maintained the same title and pay. Her work schedule—which was dictated by client needs—would have likely remained the same as there was a significant backlog of reasonable accommodation work to be done. Many of the duties and responsibilities of the job were consistent before and after her leave. Ms. Hale-Mockley credibly testified that Plaintiff would follow-up on previous cases, perform many of the same administrative duties (such as training management), and continue to engage in the interactive process. Though one aspect of her job

upon return would have been training Ms. Riffel, Plaintiff's duties as RAC included both continuity of services and special projects assigned by Ms. Hale-Mockley before she went on leave.

In addition, Defendants have shown by a preponderance of the evidence that Plaintiff was unable to perform essential functions of the job at the end of the relevant period. By their June 5 meeting, Plaintiff had been on leave for twelve weeks. At that time, Defendants granted two of Plaintiff's reasonable accommodation requests and agreed to allow her to return for a five-hour trial work period. Plaintiff, however, still had a difficult time going onsite, and many of the stressors she identified that prevented her from working in March had not yet resolved. Indeed, she had also become embroiled in a contract dispute with Defendants and MBO during her time out of the office that exacerbated her anxiety. Plaintiff also never took advantage of the five-hour trial work period Defendants offered. Based on this evidence, the Court finds that it is more likely than not that Plaintiff was unable to perform many of the essential functions of her job— including face-to-face meetings and the interactive process—at the end of her protected leave. Defendants therefore are not liable on Plaintiff's claim for FMLA interference.

## II. FMLA Retaliation and Discrimination

Plaintiff's second and third counts are both considered FMLA "retaliation" or "discrimination" claims. *Bachelder*, 259 F.3d at 1124. Section 2615(b) makes it "unlawful for any person to discharge or in any other manner discriminate against any individual because such individual has" participated in FMLA enforcement proceedings. 29 U.S.C. § 2615(b). Section 2615(a)(2) more broadly makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. *Id.* at § 2615(a)(2). For both claims, the plaintiff must show "(1) involvement in a

protected activity under the FMLA; (2) an adverse employment action; and (3) a causal link between the protected activity and the employment action." *Schultz v. Wells Fargo Bank, Nat'l Ass'n*, 970 F. Supp.2d 1039, 1059 (D. Or. Sept. 5. 2013). An adverse action in the context of retaliation clams is "any action that is 'reasonably likely to deter employees from engaging in protected activity.'" *deBarros v. Wal-Mart Stores*, No. 6:11-cv-06116-AA, 2013 WL 3199670, at *6 (D.Or. June 19, 2013) (quoting *Ray v. Henderson,* 217 F.3d 1234, 1243 (9th Cir. 2000)).

Here, Plaintiff has failed to show that there was a causal link between the alleged adverse employment action and the filing of the EEO complaint. Though there is a temporal connection between Plaintiff's EEO inquiry on April 29, 2014, and the April 30, 2014 emails revoking Plaintiff's network access and erroneously terminating Plaintiff, Mr. Hampton did not have knowledge of Plaintiff's potential EEO complaint at that time. Mr. Hampton also credibly testified that Plaintiff's network access was revoked when she had been out of the office for more than 30 days pursuant to standard security measures. Though Mr. Hampton did know of Plaintiff's complaint at the time that they discussed her return to work at the end of May and in early June, Defendants' decision to have Plaintiff train Ms. Riffel upon her return was not an adverse employment action. Because Plaintiff's position was more likely than not the same or equivalent in terms of pay, benefits, duties, and responsibilities, the addition of some training duties to her workload would not be reasonably likely to deter an employee from engaging in protected activities. Accordingly, Plaintiff has not shown by a preponderance of the evidence that Defendants retaliated or discriminated against her in violation of the FMLA.

### III.    Willfulness

As the Court previously found, Plaintiff must prove that Defendants' alleged violations of the FMLA were willful. *See* O&O 31–34, ECF 112 (Plaintiff's Amended Complaint was filed

more than two years after the acts underlying Plaintiff's claims); *see also* 29 U.S.C. § 2617(c)(2) (providing a three-year statute of limitations for violations that are willful). "[N]either the Supreme Court nor the Ninth Circuit Court of Appeals has defined willfulness under the FMLA," but "other circuits have looked to the Supreme Court's definition of 'willful' in the context of the Fair Labor Standards Act." *Shulman v. Amazon.com, Inc.*, No C13-247RSM, 2013 WL 2403256, at *2 (W.D. Wash. May 30, 2013). "Under the FLSA, an employer acts 'willfully' when he or she 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *Schultz*, 970 F.Supp.2d at 1053 (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)); *see also Hollowell v. Kaiser Found. Health Plan of the NW*, 705 Fed.Appx. 501, 503 (9th Cir. 2017) (applying *McLaughlin*'s willfulness standard to an FMLA claim).

At summary judgment, the Court concluded that—when viewing the evidence in the light most favorable to Plaintiff—there was a dispute of fact as to whether Defendants' conduct was willful. O&O 34. The evidence presented at trial, however, shows that Defendants did not either know or show reckless disregard for whether their conduct was prohibited by statute. Prior to terminating Plaintiff, Defendants consulted with the BPA legal department. After that discussion, Defendants opted not to terminate Plaintiff. Instead, Defendants offered Plaintiff her requested trial work period and made efforts to restore Plaintiff to her employment with BPA in an equivalent position. Accordingly, even assuming Defendants did violate the FMLA, Plaintiff has not shown that it is more likely that not that Defendants acted willfully.

///

///

///

19- FINDINGS OF FACT & CONCLUSIONS OF LAW

## CONCLUSION

The Court finds in favor of Defendants on all of Plaintiff's claims. Judgment shall be entered in favor of Defendants. The parties shall submit a joint proposed form of judgment within fourteen days of these Findings of Fact & Conclusions of Law.

Dated this __4__ day of __January__, __2019__.

/s/ Marco Hernández
MARCO A. HERNÁNDEZ
United States District Judge